FRANK TOTH *v.* GEORGE G. LENK, M.D.

[No. 3-874A138. Filed June 30, 1975.]

*Max E. Hobbs, Willis, Hobbs, Connor & Brown,* of Fort Wayne, for appellant.

*James V. Donadio, Ice Miller Donadio & Ryan,* of Indianapolis, *Sol Rothberg, Rothberg, Gallmeyer, Freuchtenicht & Logan,* of Fort Wayne, *William F. McNagny, Barrett, Barrett & McNagny,* of Fort Wayne, *Benton E. Gates, Gates, Gates & McNagny,* of Columbia City, for appellee.

GARRARD, J.—In 1968 Frank Toth (Toth) suffered an industrial injury for which he was treated by Dr. Lenk. Treat-

ment continued from October 9, 1968, until early April 1969. Although Toth continued to experience problems, he did not return to Dr. Lenk for further treatment. In May and June 1969, Toth returned to his native Hungary. While there, he consulted another physician for treatment regarding his condition. He had five or six consultations with that doctor. He then returned to the United States, and saw Dr. Lenk for a required re-employment physical before resuming his former employment. Toth testified in his discovery deposition that he had in fact lost faith in Dr. Lenk and decided not to seek further treatment from him. On June 7, 1970, he consulted a third doctor and allegedly for the first time actually learned of Dr. Lenk's asserted failure to properly diagnose his condition. On June 6, 1972, he brought this action against Dr. Lenk for malpractice. The trial court granted Lenk's motion for summary judgment based upon the statute of limitations, and Toth appeals.

I find the summary judgment was proper. In so doing, we are squarely confronted with the proper interpretation of our medical malpractice statute of limitations, IC 1971, 34-4-19-1 (Burns Code Ed.).

Toth contends that because a literal application of the statute could hypothesize a plaintiff upon whom the statute would expire before he knew, or in the exercise of reasonable diligence could have known, that malpractice had been committed, the only application of the statute which comports with due process is to interpret it as commencing to run only with the actual discovery of the malpractice.

> Our statute requires that the action be "filed within two [2] years from the date of the act, omission or neglect complained of."

The statute thus differs from the general statute governing personal injuries, IC 1971, 34-1-2-2 (Burns Code Ed.) which

> requires that such actions be commenced within two years "after the cause of action has accrued." Clearly the choice of terminology in the malpractice statute

is more restrictive. It is intended to avoid, in medical malpractice cases, the impact of that line of case law holding that "accrual of the action" phraseology extends the time for commencing an action where either the injury or damage (essential elements of the tort) do not occur until long after the act or omission which gave rise to them. See, *Montgomery* v. *Crum* (1928), 199 Ind. 660, 161 N.E. 251; *Merritt* v. *Economy Dept. Stores* (1955), 125 Ind. App. 560, 128 N.E.2d 279.

There can be no doubt that the legislature did not intend actual discovery to be the event that triggers the commencement of the statutory period.

Furthermore, as observed by the Court in *Guthrie* v. *Wilson* (1959), 240 Ind. 188, 162 N.E.2d 79, statutes of limitations generally address merely the remedy rather than the right. They are not therefore violative of due process, at least, so long as a potential plaintiff is afforded some not unreasonably short period of time within which to bring his action.

On the other hand, in *Chaffin* v. *Nicosia* (1974), 261 Ind. 698, 310 N.E.2d 867, our Supreme Court recently held the relief provisions of our disability statute, IC 1971, 34-1-2-5 (Burns Code Ed.) applicable to medical malpractice cases. In so doing, the Court relied upon the doctrine of the reasonable construction of statutes stating:[1]

> "This statute's [IC 1971, 34-4-19-1] application to a given case must not be allowed to produce an absurd result, which the legislature, as a reasonably minded body, could not have possibly intended:
>
>> '. . . it would be illogical and unintelligent to say that a person who does not know, and cannot know . . . would be denied damages because his claim . . . was filed due to delay in learning . . .'" 310 N.E.2d 870.

Thus, while our statute speaks of the "act, omission or neglect complained of" it does not appear that the legislature

---

1. It seems to me that whether or not the rule of construction may be truly said to be an application of due process rests largely in semantics or an examination of technical antecedents. Certainly, if separate, both requirements have a common genesis.

thereby intended to deprive a patient of a remedy by way of an action for malpractice if he did not and *could not* have known of his claim within two years after the initial act, omission or neglect.[2] As heretofore mentioned, the reason for the more restrictive language in the malpractice statute appears designed to preclude delaying operation of the statute until damage or injury actually occurs.

Despite its rather clear language, must our statute be construed to include the proviso that the statute will not commence to run until the plaintiff, in the exercise of reasonable care, ought to have known of the malpractice in order to avoid unreasonable harshness on the hypothetical plaintiff? In prior decisions our courts have generally acknowledged the legislative intent (apart from the case of the hypothetical plaintiff who could not know) that the limitation period operate promptly. *Chaffin, supra; Guy* v. *Schuldt* (1956), 236 Ind. 101, 138 N.E.2d 891.

In *Guy* v. *Schuldt, supra,* our Supreme Court held that fraud would estop a physician from relying on the statute of limitations and that accordingly the statute could not be set up by demurrer since to do so would preclude the plaintiff's ability to assert fraud in a reply.

The *Guy* court surmised that due to the nature of the physician-patient relationship, the running of the statute might be prevented. The Court reaffirmed the general principles of an estoppel for fraud, which require both intentional conduct by the defendant, and that the plaintiff, relying upon the defense, not only be unaware of the fraud, but also have been unable to discover it in the exercise of diligence. The duty of the physician to disclose that which he knows, or in

---

2. I do not believe those cases in other jurisdictions which stand for the proposition that a statute will not be declared violative of due process simply because it operates harshly in an exceptional instance are controlling on this question. See, e.g. *Hargrave* v. *Brackett Stripping Machine Co.* (E.D. Tenn. 1970), 317 F. Supp. 676. We are concerned with the proper interpretation of the statute, rather than its validity after that interpretation is discovered. Secondly, the potential class to be barred does not appear so exceptional or insignificant as to be *de minimus.*

the exercise of reasonable care should have known, satisfies the requirement of conduct and constitutes a constructive fraud.[3]

Under this analysis the constructive fraud would terminate with the termination of the physician-patient relationship and the statute would commence to run. *Guy, supra; Ostojic v. Brueckmann* (C.A. 7th 1968), 405 F. 2d 302.

It must be emphasized, however, that the nature of the exception is equitable and relies upon an estoppel theory.

Accordingly, where the patient learns of the malpractice or learns information which would lead to discovery of the malpractice if the patient exercised diligence to discover, the statute will commence to run.[4] *Guy, supra; Ostojic, supra.*

In *Montgomery* v. *Crum* (1928), 199 Ind. 660, 161 N.E. 251, our Supreme Court recognized that where an entire course of conduct combines to produce the injury, it may constitute a continuing wrong so as to delay the running of the statute. This theory has been applied in some jurisdictions to medical malpractice cases for the duration of the treatment provided by the physician. *Wyler* v. *Tripi* (1971), 25 Ohio St. 2d 164, 267 N.E.2d 419.

It would appear that the result-purpose of each of these doctrines is to provide protection to the patient who has been necessarily unaware of the wrong that has been done, and that accordingly, reasonable opportunity to bring suit is afforded by the statute under these rationales without making it necessary to construe the statutory language as necessarily implying a qualification for the ability to discover in the exercise of reasonable care.

We turn then to the propriety of the summary judgment. Toth argues that even in the absence of a discovery requirement, a disputed question of material fact exists as to when

3. Note that if the physician committed malpractice *a fortiori* he should have known.

4. Until the patient learns something to the contrary he is entitled to rely upon the physician faithfully discharging his duty.

the doctor-patient relationship terminated. This, however, ignores the other aspect of the exception that will commence the statute running: Actual knowledge by the patient which, if pursued with diligence, would provide discovery.

Ordinarily, such factual questions preclude summary judgment because the facts themselves are in dispute or, if not, are susceptible to more than one reasonable inference. Additionally, there are times when summary judgment may be inappropriate even though the essential facts are not in dispute and appear to lead to one reasonable conclusion, because the matters appearing in the record before the court at the time do not foreclose the prospect of additional witnesses or evidence which, if presented at trial, would be sufficient to avoid a directed verdict in favor of the proponent of the motion.

Here, however, on the issue presented, the dispositional question is uniquely restricted to the conduct of the plaintiff and defendant, each of whom were thoroughly deposed prior to consideration of the summary judgment.

Actual treatment for the condition by Dr. Lenk ceased some 38 months before suit was commenced, yet Toth admitted that he continued to experience pain and problems the entire time. Three years before filing the action he consulted another physician by whom he was treated on five or six occasions. This physician told him that upon returning to the United States he should see a physician because of his hip. He admitted that in the fall of 1969 he did not return to Lenk because he believed Lenk was not helping him and because he had no faith in Lenk. There is no allegation of actual deliberate fraud.

The evidence most favorable to Toth clearly establishes that at some time prior to June 6, 1970, two years before suit was commenced, Toth ceased relying on Lenk and decided to secure no further treatment from him. At the time he did this he was aware of the continuing nature of his problem and was convinced that Lenk was not properly identifying

the problem or providing proper treatment. This series of undisputed facts fulfills the requirements to set the statute in operation. It is knowledge of the condition or "injury" rather than its reason that destroys the estoppel and permits the statute to operate. Cf. *Withers* v. *Sterling Drug Inc.* (S.D. Ind. 1970), 319 F. Supp. 878.

Thus, in lay language, where the patient knows or concludes that something is wrong in the diagnosis or treatment he has been given, he is chargeable as a matter of law with the additional knowledge he would have procured had he exercised diligence to discover it.

The only reasonable inference to be drawn from the facts at bar is that the statute commenced to run prior to June 6, 1970.

Summary judgment was therefore correct.

Affirmed.

Staton, P.J., concurs; Hoffman, J., concurs with opinion.

### CONCURRING OPINION

HOFFMAN, J.—This appeal arises from an entry of summary judgment in favor of defendant-appellee George G. Lenk, M.D. (Dr. Lenk). Plaintiff-appellant Frank Toth (Toth) brought an action against Dr. Lenk seeking to recover damages resulting from alleged medical malpractice by Dr. Lenk.

On appeal, Toth asserts that the trial court erred in failing to hold that the statute of limitations for medical malpractice actions, IC 1971, 34-4-19-1 (Burns Code Ed.), runs from the date of discovery of the malpractice, and in granting summary judgment in favor of Dr. Lenk where a material issue of fact existed.

Appellant's first contention is that the trial court's construction of IC 1971, 34-4-19-1, *supra,* is contrary to law because under Indiana law such statute must be read to include a provision tolling the running of the statutory period where a patient is unaware that he has been injured, until such

patient makes a "discovery" of his injury. In taking this position, appellant urges that such is the law of this State because under our Constitutions it is impermissible to deprive one of his property right in a cause of action where an injury has been committed (and a right of action exists), but the injured party is unaware of it. This specific question of law has not been decided in Indiana.

The question thus presented to this court bears directly and substantially upon an area which is presently the subject of intense public and professional concern and controversy, and which immediately affects the lives and careers of many individuals. Before embarking upon a determination of this question, it is beneficial to examine the varying approaches taken by our sister-States to the "discovery" rule urged by appellant. In the recent case of *Wyler* v. *Tripi* (1971), 25 Ohio St. 2d 164, 267 N.E.2d 419, at 420-422, the Supreme Court of Ohio summarized the many theories with regard to such rule and the law thereon in the several States as follows:

> "In some jurisdictions, the strict general rule that a cause of action accrues at the date of the alleged wrong is applied to medical malpractice cases. (Citations omitted.) However, in the early 1930's most courts began developing exceptions to the general rule in an attempt to avoid the harsh results which often arose under facts peculiar to medical malpractice cases. 32 Indiana L.J. 528, 529. For example, some courts now allow a plaintiff to sue for breach of contract so as to take advantage of a longer statute of limitations. * * * In other jurisdictions, a continuous treatment theory has been used by the courts in situations where a doctor leaves a foreign object in the body of a patient and continues to treat him after the operation. The physician is said to be negligent not only in his initial act, but also in allowing the object to remain in the patient's body while the patient is still under his care. According to this analysis, the statute of limitations does not begin to run until the patient leaves the care of the physician. (Citation omitted.) In some jurisdictions, the statute of limitations does not begin to run until discovery of the negligently caused condition, if the physician has fraudulently concealed his negligent conduct. * * * Finally, a few jurisdictions have expanded the fraudulent concealment doctrine by finding *constructive* fraudulent

concealment in the failure of the physician to inform the patient of the negligence, where the physician knew or should have known it occurred.

\* \* \*

"The courts in 21 states presently do not apply the discovery rule, applying instead either the strict general rule or the exceptions to the general rule noted above. Ten jurisdictions have adopted the discovery rule, but have specifically limited it to cases where a foreign object (surgical sponge, gauze, forceps, etc.) has been negligently left in the patient's body. Eleven states have adopted the discovery rule for all malpractice cases regardless of whether a foreign object is involved. Two states have adopted the discovery rule by statute."

(See omitted footnotes for citation of numerous cases.)

The statute of limitations applicable to medical malpractice actions in Indiana contains no express "discovery" provision. IC 1971, 34-4-19-1, *supra,* provides:

"Malpractice—Limitation of actions.—No action of any kind for damages, whether brought in contract or tort, based upon professional services rendered or which should have been rendered, shall be brought, commenced or maintained, in any of the courts of this state against physicians, dentists, surgeons, hospitals, sanitariums, or others, unless said action is filed within two [2] years from the date of the act, omission or neglect complained of."

Our courts have held that only two exceptions exist from the express terms of this statute. In the case of *Guy* v. *Schuldt, et al.* (1956), 236 Ind. 101, 138 N.E.2d 891, our Supreme Court applied to this statute the equitable rule that the running of a statute of limitations is tolled during the period that one acts to fraudulently conceal a cause of action from a party he has injured, thereby causing a late commencement of the action. And, in the case of *Chaffin* v. *Nicosia* (1974), 261 Ind. 698, 310 N.E.2d 867, our Supreme Court held that the legal disability statute[1] acted to provide a period of grace within which minors may bring medical malpractice actions after reaching majority.

---

1. IC 1971, 34-1-2-5 (Burns Code Ed.).

As stated above, appellant urges that the statute will unconstitutionally deny due process unless a third exception is made to its terms: that the 2-year time limit therein run from the date of discovery of the malpractice, even where such date is subsequent to the termination of the physician-patient relationship.[2]

It is unclear from the argument presented in appellant's brief whether he relies upon the Federal constitutional due process provision applicable to the States, or upon the provision in Art. 1, § 12 of our State Constitution guaranteeing that each injured person "shall have remedy by due course of law." However, an examination of these provisions reveals that it is unnecessary to make a determination as to the exact basis for appellant's contention.

In the recent case of *Barrick Realty, Incorporated* v. *City of Gary, Indiana* (1973), 354 F. Supp. 126,[3] the United States District Court for the Northern District of Indiana, Hammond Division, discussed the relationship of these Federal and State due process provisions in deciding whether abstention was proper to allow our Indiana courts to decide whether a certain statute was constitutional under our State Constitution. Therein, at 130 of 354 F. Supp., the court concluded:

"[T]he state constitutional provisions upon which plaintiffs primarily rely in their brief, relating to equal protection, due process, and freedom of speech, are merely counterparts of federal constitutional provisions."

The courts of this State have similarly treated the two provisions now under consideration. See: *e.g., Board of Zoning App. etc.* v. *LaDow et al.* (1958), 238 Ind. 673, 153 N.E.2d 599. Thus, substantially the same question is presented under either provision.

---

2. Where such discovery antedates the termination of the physician-patient relationship, the 2-year period runs from such earlier date under present law. This is because the tolling of such period during the existence of a physician-patient relationship is based upon a presumed fraudulent concealment of the malpractice by the physician under *Guy* v. *Schuldt, et al.* (1956), 236 Ind. 101, 138 N.E. 2d 891, however, where the patient has actual knowledge of the injury there can be no such concealment.

3. Affirmed, 491 F. 2d 161.

Statutes of limitation such as that in the case at bar have been uniformly considered to be procedural in Indiana. See: *Horvath* v. *Davidson* (1970), 148 Ind. App. 203, 264 N.E.2d 328, and cases cited therein. Therefore, appellant's exact assertion must be taken to be that the imposition of a statute of limitations running from the date of an injury would be a governmental act operating to deny him a property right without benefit of procedural due process.[4]

In passing upon this contention, it must be remembered that when a party questions the constitutionality of a statute or an action of the Legislature, he assumes a burden of overcoming a strong presumption favoring the constitutionality

---

4. It is possible to view appellant's contention as asserting a constitutional right of access to the courts. This contention has been decided adversely to appellant by the Supreme Court of the United States in *Boddie* v. *Connecticut* (1971), 401 U.S. 371, at 375-376, 28 L.Ed. 2d 113, at 117, 91 S.Ct. 780, at 784-785:

"American society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement. Within this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of due process in the operation of this system. Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without due process of law, the State's monopoly over techniques for binding conflict resolution could hardly be said to be acceptable under our scheme of things. Only by providing that the social enforcement mechanism must function strictly within these bounds can we hope to maintain an ordered society that is also just. It is upon this premise that this Court has through years of adjudication put flesh upon the due process principle.

"Such litigation has, however, typically involved rights of defendants —not, as here, persons seeking access to the judicial process in the first instance. This is because our society has been so structured that *resort to the courts is not usually the only available, legitimate means of resolving private disputes.* Indeed, private structuring of individual relationships and repair of their breach is largely encouraged in American life, subject only to the caveat that the formal judicial process, if resorted to, is paramount. Thus, this Court has seldom been asked to view access to the courts as an element of due process. *The legitimacy of the State's monopoly over techniques of final dispute settlement, even where some are denied access to its use, stands unimpaired where recognized, effective alternatives for the adjustment of differences remain.*" (Emphasis supplied.)

The court went on to state that substantial constitutional access questions arise only where the sole means of legitimate dispute settlement lies in the courts, as in the area of divorce. See also: United States v. Kras (1973), 409 U.S. 434, 34 L.Ed.2d 626, 93 S.Ct. 631.

of such statute or action. *Heminger* v. *Police Com'n. of City of Fort Wayne* (1974), 161 Ind. App. 72, 314 N.E.2d 827. Further, it has been stated that it is the duty of the courts to uphold the acts of the Legislature if it can possibly be done without doing violence to the Constitution; and in doing so, every reasonable presumption must be indulged in favor of the legality of such acts. *Lawrence* v. *State* (1972), 259 Ind. 306, 286 N.E.2d 830. And, this court must be mindful that statutes of limitation are favored by the law. *Wood* v. *Carpenter* (1879), 101 U.S. 135, 25 L.Ed. 807.

The nature of the procedural due process right relied upon by appellant to support his constitutional attack is succinctly expressed in *Morrissey* v. *Brewer* (1972), 408 U.S. 471, at 481, 33 L.Ed.2d 484, at 494, 92 S.Ct. 2593, at 2600:

> "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' Joint Anti-Fascist Refugee Committee v. McGrath, 341 US 123, 168, 95 L Ed 817, 852, 71 S Ct 624 (1951) (Frankfurter, J. concurring), quoted in Goldberg v. Kelly, 397 US 254, 263, 25 L Ed 2d 287, 296, 90 S Ct 1011 (1970). The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. Fuentes v. Shevin, 407 US 67, 32 L Ed 2d 556, 92 S Ct 1983 (1972). Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' Cafeteria & Restaurant Workers Union v. McElroy, 367 US 886, 895, 6 L Ed 2d 1230, 1236, 81 S Ct 1743 (1961)."

It cannot seriously be contended that a bona fide victim of medical malpractice does not have an interest in his claim worthy of due process protections. However, as stated above, a determination that due process protections must be ac-

corded a certain interest gives rise to a second question: What process is due? The reasoning process by which this decision must be made is explained in *Hagopian* v. *Knowlton* (2d Cir., 1972), 470 F.2d 201, at 207, as follows:

"In approaching the question of what process is due before governmental action adversely affecting private interests may properly be taken, it must be recognized that due process is not a rigid formula or simple rule of thumb to be applied undeviatingly to any given set of facts. On the contrary, it is a flexible concept which depends upon the balancing of various factors * * *. The full context must therefore be considered in each case." See also: *United States ex rel. Martinez* v. *Alldredge* (1972), 468 F.2d 684, at 687, *cert. denied,* 412 U.S. 920 (1973).

An examination of the full context of the procedural due process question presented by the case at bar reveals that among the factors to be balanced in passing upon the constitutionality of the statute are: 1) the purposes of the statute; 2) the right of an injured party to seek redress; and, 3) the right of a defendant to a fair trial at a time when the occurrence of the operative facts is not so long past that a meaningful defense cannot be marshalled.

A similar analysis was employed by the court in *Hargraves* v. *Brackett Stripping Machine Company* (E.D. Tenn. 1970), 317 F. Supp. 676, in passing upon an assertion strikingly similar to that of appellant-Toth. Therein, the court examined the purposes served by statutes of limitations, reviewed the rights of the parties, and passed upon the constitutionality of another "flat" statute of limitations, in this manner:

"Statutes of limitation have been part of the law of every civilized nation from time immemorial. Since each sovereignty may organize its judicial tribunals according to its own notions of policy, it has been recognized since the early days of this republic that statutes of limitation are within the sovereign power of each state to enact. (Citing authority.) Such statutes, having the effect of denying any judicial remedy for the enforcement of an otherwise valid claim, are justified on grounds of policy and as statutes of repose 'designed to protect the citizens from stale and vexatious claims and to make an end to the possibility of

litigation after the lapse of a reasonable time.' (Citing authority.)

The legislative body, in enacting such legislation, may weigh the conflicting interests between one person's right to enforce an otherwise valid claim and another person's right to be confronted with any claim against him before the lapse of time has likely rendered unavailable or difficult the matter of obtaining or presenting proof. Any balance of these conflicting interests which is not arbitrary or capricious is within the legislative authority and not subject to constitutional attack for lack of due process. As stated by Justice Baldwin in dealing with the validity of a state recording law in the case of Jackson ex dem. Hart v. Lamphire, 3 Pet. (280 [28] U.S.) 280, 7 L.Ed. 679 (1830):

'Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned. The time and manner of their operation, the exceptions to them, and *the acts from which the time limited shall begin to run,* will generally depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country and the emergency which leads to their enactment. Cases may occur where the provisions of a law on those subjects may be so unreasonable as to amount to a denial of a right, and call for the interposition of the court; but the present is not one.' (Emphasis supplied)

*"Thus the relevant test of due process here is basically the test of reasonableness. If in balancing the conflicting interests of the parties reason can be established, or, stated in reverse, if a lack of arbitrariness can be established in the selection of the date of the wrongful act or the date of the sale of a defective product as the inception date for the running of the statute of limitations in a personal injury action, no constitutional attack on such legislation would lie.* Since in every personal injury lawsuit the proof must include evidence of a breach of duty, a wrongful act or a defect in a product, the effect of the lapse of time in the availability of proof of such matters would not be as unreasonable concern for a legislative body to have in mind in the enactment of a statute of limitations. The reasonableness of such a concern becomes the more weighty when it is recognized that in by far the great majority of personal injury cases the wrongful act and the injury follow in close sequence, with no significant lapse of time between the two. Only in a relatively few instances will there be a significant time interval between the two, with product liability cases furnishing the most frequent illustration of such an interval.

Even in product liability cases the lapse of time between the wrongful act or the sale of a defective product and the occurrence of the injury is often not a significant one.

"When the foregoing matters are weighed against the right of an injured party to seek judicial relief in the exceptional instance where more than a year has elapsed between the wrongful act or the sale of a defective product and the injury, this Court is of the opinion that legislation adopting the date of the wrongful act or the date of the sale of the defective product as the inception date for the running of a statute of limitations cannot be said to be so arbitrary or capricious as to fall under the ban of the Due Process Clause. A statute of limitations must be judged in the light of the broad class of cases to which it applies and if it is reasonable with respect to the class, it will not be judged unreasonable merely because it is deemed to operate harshly in a particular or exceptional instance." 317 F.Supp. at 682-683. (Emphasis supplied in part.)

The court in *Hargraves* accurately stated the long-recognized purposes and validity of statutes of limitation. See: *Bell* v. *Morrison et al.* (1828), 1 Pet. (26 U.S.) 351, 360, 7 L.Ed. 174; *Roland Electrical Co.* v. *Black* (1947), 163 F.2d 417; *High et al.* v. *Board of Commissioners of Shelby County* (1884), 92 Ind. 580.

The court also properly recognized the competing interests of plaintiffs and defendants in such actions. Cf: *Owens* v. *White* (1967), 380 F.2d 310. Furthermore, because the various factors present must be balanced in procedural due process cases, *Hagopian* v. *Knowlton, supra; United States ex rel. Martinez* v. *Alldredge, supra;* the court correctly adopted a "reasonableness" or "lack of arbitrariness" test in passing upon the constitutionality of the statute there at issue. A similar standard must prevail in the case at bar.

The question thus narrows to whether the statute is reasonable and non-arbitrary, considering the purposes of such statutes and the rights of the plaintiffs and defendants in such actions. Stated differently, the question is whether the statute as written by the Legislature reasonably balances the competing considerations enumerated above. In light of the inability of defendants to adequately defend such actions due

to the eventual dissipation of documentary evidence and the frailties of human memory where the commencement of such actions is remote in time from the occurrence of the operative facts, and because there is a need for a degree of stability in human affairs from reliance upon the correctness of acts long past, it is apparent that a limitation upon the commencement of such actions is both desirable and reasonably necessary. Further, it is equally apparent that even the most fundamental concepts of procedural due process must countenance a period within which these actions may be brought. *Guthrie* v. *Wilson* (1959), 240 Ind. 188, 162 N.E.2d 79. Has the Legislature, in weighing these considerations and placing a bar to such actions two years after the occurrence of the operative facts, acted so unreasonably and arbitrarily as to offend the dictates of procedural due process? The question must be answered in the negative.

This reasoning is strengthened by the fact that equivalent malpractice statutes of limitation have been held constitutional. See: *Clark* v. *Gulesian* (1970), 429 F.2d 405, *cert. denied,* 400 U.S. 993; *Pittman* v. *United States* (1965), 341 F.2d 739, *cert. denied,* 382 U.S. 941, and cases cited therein. Also, statutes of limitations as to other types of actions run in a manner similar to the statute here at issue. See: *Barnett* v. *Louisville and Nashville Railroad Company* (6th Cir., 1969), 407 F.2d 1333; *Zuck* v. *Interstate Publishing Corp.* (2nd Cir., 1963), 317 F.2d 727. Additionally, the statute of limitations under consideration in the case at bar has been uniformly applied in a "flat" manner. See: *Ostojic* v. *Brueckmann* (7th Cir., 1968), 405 F.2d 302; *Sheets* v. *Burman* (5th Cir., 1963), 322 F.2d 277; *Blank* v. *Community Hospital* (1968), 143 Ind. App. 333, 240 N.E.2d 562 (transfer denied). Moreover, our Supreme Court has held that under Indiana law a mere lack of knowledge or failure to discover a cause of action will not stop the running of the applicable statute of limitations. See: *Fidelity, etc., Co.* v. *Jasper Furniture Co.* (1917), 186 Ind. 566, 117 N.E. 258; *Craven* v. *Craven* (1913), 181 Ind. 553, 103 N.E. 333. Finally, as our Supreme

Court stated in *Sherfey* v. *City of Brazil* (1938), 213 Ind. 493, at 508, 13 N.E.2d 568, at 574:

"If appellant is entitled, under the Constitution, to the enforcement of his common law action, free of any legislative restraint, then the General Assembly possesses no power to prescribe any limit within which such actions shall be brought. Such a conclusion is wholly untenable. Statutes of limitations are founded on State policy. They are regarded as statutes of repose and the Legislature, out of consideration for the public welfare, may fix periods within which actions may be brought, without making any exceptions whatever."

In deciding the case at bar, this court may pass only upon the constitutionality of the statute. It may not interpose its judgment as to this matter for that of the Legislature upon the ground that this statute is unwise, or, infrequently, even unjust. *Kerr* v. *Perry School Tp.* (1904), 162 Ind. 310, 70 N.E. 246; *Praigg et al.* v. *The Western Paving and Supply Co.* (1896), 143 Ind. 358, 42 N.E. 750.

Aside from the constitutional issue, it must be noted that appellant's argument that he is deprived of a *right* by this statute of limitations is somewhat tenuous in view of the venerable rule that statutes of limitation affect only the *remedy* and not the right. *Karvalsky* v. *Becker* (1940), 217 Ind. 524, 29 N.E.2d 560, 131 A.L.R. 1074; *Hendricks and Another* v. *Comstock* (1859), 12 Ind. 238. Furthermore, the Federal cases cited by appellant[5] are inapposite in that they concern the application of IC 1971, 34-1-2-2 (Burns Code Ed.), which prescribes that certain periods of limitation commence to run from the *accrual* of a cause of action, rather than the "act, omission or neglect complained of."

Moreover, appellant's position is inconsistent with that of our Supreme Court in *Guy* v. *Schuldt, et al., supra.* Therein, at 109 of 236 Ind., at 895 of 138 N.E.2d, the court stated:

"After the relationship of physician and patient is terminated the patient has full opportunity for discovery and no longer is there a reliance by the patient nor a corresponding

---

5. Essex Wire Corporation v. M.H. Hilt Company (7th Cir., 1959), 263 F. 2d 599; Withers v. Sterling Drug Inc. (1970), 319 F. Supp. 878.

duty of the physician to advise or inform. The statute of limitations is no longer tolled by any fraudulent concealment and begins to run."

Under appellant's theory, the date of termination of the physician-patient relationship is irrelevant: A discovery of the malpractice prior to the termination of such relationship starts the running of the statutory period under present law (see footnote 2) and, under appellant's theory, if the discovery were subsequent to such termination the statute would not run until such discovery. Thus, appellant's construction would cause the statutory period to run always from a date of discovery, not from the date of termination of the physician-patient relationship. It is apparent that appellant's position is markedly inconsistent with the law as stated by the Legislature and our Supreme Court.

The trial court in the case at bar correctly ruled that under the law appellant's action would be barred if it were not commenced within two years of the act, omission or neglect complained of, or within two years of the termination of the physician-patient relationship as to the particular medical problem which occasioned the malpractice.

The next issue which must be considered herein is whether the trial court properly found that no material issue of fact existed in granting summary judgment in favor of appellee-Dr. Lenk. Toth contends that even if the 2-year time limit provided in IC 1971, 34-4-19-1, *supra,* does not run from the date of discovery of an act of malpractice, still there is a genuine issue as to the material fact of whether the physician-patient relationship between himself and Dr. Lenk terminated less than two years prior to the institution of this action on June 6, 1972.

The facts and inferences in the pleadings, depositions and affidavit contained in the record of this cause most favorable to Toth (the non-moving party) establish that he consulted a Dr. Hershberger on June 7, 1970. During such visit, he learned for the first time that his right hip joint had been

injured in an industrial accident about two years previously, resulting in damage to his right femur.

Subsequent to this injury, and for some time thereafter, Toth was treated by Dr. Lenk. Dr. Lenk and Toth last saw each other, in a professional relationship or otherwise, on or about August 25, 1969, when Toth presented himself for treatment.

Toth has attempted to show a material issue of fact as to the date of termination of his physician-patient relationship with Dr. Lenk by directing the court's attention to certain events subsequent to his final treatment by Dr. Lenk on August 25, 1969.

In this regard, Toth first points to the continuing contractual relationship between Dr. Lenk and Toth's employer. He asserts that because Dr. Lenk continued to be the "Medical Director" for Toth's employer, the physician-patient relationship likewise continued. However, it is fundamental that the creation or continuation of a physician-patient relationship requires a mutual assent to the application of a course of treatment. Such assent cannot arise or continue solely by reason of a common relationship with a business entity.

Appellant also asserts that a continuation of the relationship is shown by Dr. Lenk's approval, during a consultation prior to August 25, 1969, of Toth's return to work under certain continuing medical restrictions, and by a statement by Dr. Lenk in his deposition that at unspecified times he "asked about his [Toth's] progress" with personnel at the dispensary maintained by Toth's employer. The making of these assertions reveals appellant's misapprehension of the rule tolling the running of the period of limitation during the continuance of a physician-patient relationship after an alleged act of malpractice. As stated hereinabove, such rule has as its basis a presumption of fraudulent concealment arising by reason of the fiduciary nature of the relationship. Inasmuch as representations by the physician are the foundation for the suspension of the statute, the period of such

suspension must terminate following the last consultation or other demonstrable opportunity for misrepresentations to the patient by the physician during treatments for the particular malady. Thus, for the purposes of the statute of limitations a physician-patient relationship must be regarded as terminating as of the last such opportunity for misrepresentation.

In the case at bar, the record reflects that the last consultation between Dr. Lenk and Toth occurred on or about August 25, 1969, at the latest. Furthermore, the record reveals no contact between Toth and Dr. Lenk following such date and is devoid of any suggestion that the nurse present in the plant was subject to the direction and control of Dr. Lenk. The facts relied upon by Toth are insufficient as a matter of law to avoid the commencement of the period of limitation upon the termination of his relationship with Dr. Lenk.

Appellant's final assertion attempting to show a material issue of fact concerns a letter from Dr. Lenk to an insurance agent on October 15, 1970, subsequent to Toth's discovery of his injury. Such letter also does not reveal any consultations or representations by Dr. Lenk subsequent to August 25, 1969, and thus fails to avoid the statutory bar.

The trial court correctly applied the law as to discovery of alleged acts of malpractice, and properly held that upon the **undisputed** material facts of this cause, summary judgment should be granted.

The judgment of the trial court should be affirmed.

NOTE.—Reported at 330 N.E.2d 336.