Barbara CARROW and Larry Carrow, Appellants (Plaintiffs Below),

v.

Ralph STREETER, M.D., Appellee (Defendant Below).

No. 2–379A79.

Court of Appeals of Indiana, Second District.

Oct. 14, 1980.

John F. Townsend, Jr., Townsend, Hovde & Townsend, Indianapolis, for appellants.

Richard L. Fairchild, Stewart, Irwin, Gilliom, Fuller & Meyer, Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Plaintiffs Barbara Carrow (Carrow) and Larry Carrow, husband and wife, appeal from a summary judgment granted in favor of the defendant Dr. Ralph Streeter, M.D., in a professional malpractice action claiming that a genuine issue of material fact existed as to whether the running of the statute of limitations was tolled by fraudulent concealment.

Judgment reversed.

## FACTS

After the birth of her last child in 1964 Barbara Carrow was referred by her family

physician, Dr. Siebe, to the defendant, Ralph Streeter, an obstetrician–gynecologist for treatment of a fibroid uterus. On September 24, 1964, Dr. Streeter performed a suspension of Carrow's uterus to correct a retrodisplacement. Dr. Streeter further treated Carrow for a miscarriage on May 17, 1971, and she returned to him for three more visits.

On July 18, 1973, Carrow was admitted to Community Hospital in Indianapolis for an abdominocision to investigate heavy bleeding and pain. The next day Dr. Streeter performed a total hysterectomy on Carrow to correct the retrodisplaced uterus. Before the operation Streeter informed Carrow that he would remove the uterus and possibly the tubes and ovaries depending on the condition of her abdomen. He made no mention of the use of stainless steel sutures [1] nor did he discuss the sutures with Carrow soon after the surgery. The only complication in the surgery was an unusually adamant bladder flap, which caused Carrow to be held in the hospital three days beyond the normal time for a hysterectomy.

During the operation Streeter laid a row of stainless steel sutures at the top of the vaginal vault with the intention that these sutures would remain permanently. Streeter testified that this was his usual procedure, which he preferred to the use of silk or catgut sutures because the stainless steel reduced infection and minimized post–operative bleeding.

After the operation, Carrow experienced continuous abdominal pain, until July 1975. The pain centered in the area of the scar and extended to her back. It worsened upon standing, walking, physical exertion, urination, or intercourse.

Carrow returned to Streeter on August 23, 1973 for a routine post–operative examination. She complained of the pain but the steel sutures were not discussed. Streeter told her that pain was normal and would eventually go away. He recommended exercises to tighten her stomach muscles and prescribed Urispas, a muscle relaxant and pain medication.

Carrow returned to Streeter for a second visit on January 11, 1974, complaining of the pain which Streeter diagnosed as left round ligament pain. Streeter told Carrow that her pain was basically a psychological reaction to the hysterectomy. He again prescribed pills.[2]

Carrow last visited Streeter on April 1, 1974, again complaining of the same pain. Streeter examined her but felt no staples out of place. He mentioned a laparoscopic exam but did not recommend that it be done because ninety–five percent of the time the exam showed nothing. He gave her a one–year prescription of the same medication and again represented that the pain was mental and could take a couple of years to go away.

Carrow testified that the sutures were discussed in either the January 11, 1974 or the April 1, 1974 visit. Streeter stated that the sutures would eventually come out and that pain could be associated with them. He told her they could work their way out and fall into the vagina, the bladder or another organ and then pass out through those routes. Streeter also indicated the sutures could come out through the abdominal wall and could be plucked out with tweezers but "there was nothing to worry about."

Streeter's testimony indicates his awareness that the sutures could become displaced if the vagina lengthened after surgery, and that even though the sutures could not be felt by the patient while in the tissue, as they began to work out they would cause pain. Streeter said that this pain would be a sticking sensation in the pelvis.

---

1. Streeter indicated in his deposition that he had told Carrow he would perform a total hysterectomy, including removal of the tubes and ovaries. He also testified that he probably had informed Carrow of the use of stainless steel sutures since that was his usual procedure.

2. Streeter denied in his deposition that he had ever told Carrow her pain was psychological. He testified that she was a normal patient.

 After the April 1 visit to Streeter, Carrow pursued medical attention from other doctors. During the entire period she continued to see her family doctor, Dr. Siebe. Siebe told Carrow that he had consulted with Streeter, that Streeter believed her pain was mental, and that she should have faith in him.[3] Streeter did not recall these conversations in his deposition. Carrow was also referred by Siebe after the April 1 visit to Dr. Werster for a complete urological and bowel examination, which proved negative, and she was treated by Siebe's vacation replacement for a bladder infection.

Carrow testified that after the January 11, 1974 visit she did not think that the pain was mental. After the April 1, 1974 visit she disbelieved Streeter and decided to cease going to him, but after consultation with her husband following the visit, she decided to accept Streeter's advice and wait for the pain to go away.

In July 1975 Carrow changed family doctors to Dr. Hennessee, who referred her to Drs. Webb and Cline for treatment of the pain. Dr. Cline discovered the sutures out of place on July 7, 1975. He removed most of the sutures surgically and ninety–five percent of the pain subsided. After removal of the last sutures in May 1976, all of the pain disappeared.

On July 25, 1976, Carrow filed a medical malpractice suit arising from the injuries sustained by the hysterectomy. The court granted summary judgment against Carrow because of expiration of the statute of limitations.

## ISSUE

The sole issue presented for review is whether there existed a genuine issue of a material fact as to the running of the statute of limitations against Carrow. More precisely stated, we must determine if a material issue of fact exists as to whether

the running of the statute of limitations was tolled by fraudulent concealment.

## PARTIES' CONTENTIONS

Carrow contends that the physician–patient relationship did not terminate until July 1975, the date she first saw Dr. Cline. She alleges that Streeter's representation that her pain was entirely psychological impeded discovery of the true cause of her injury and that she reasonably relied upon Streeter's representations until she was driven by pain to consult Drs. Hennessee, Webb and Cline in July 1975. She urges us to find that a genuine issue of material fact exists as to whether the doctrine of fraudulent concealment tolled the running of the statute of limitations until two years before her suit was filed.

Streeter counters that the evidence most favorable to Carrow shows that the physician–patient relationship ended at least by April 1, 1974, the date of her last visit. He says Carrow clearly ceased to rely on his representations on this day and that she no longer believed his diagnosis and decided to secure no further treatment from him. Therefore, the fraudulent concealment doctrine ceased to toll the statute of limitations on April 1, 1974, and suit was filed more than two years later, rendering summary judgment on the statute of limitations proper.

## DECISION

*CONCLUSION*—We conclude that material issues of fact exist whether (1) the doctrine of fraudulent concealment applies so as to toll the statute of limitations and (2) whether the doctrine, if applicable, ceased tolling the statute of limitations more than two years before Carrow filed her complaint.

 For those with a penchant for repetition we repeat familiar principles. Summary judgment may be granted only if the

---

**3.** When considering evidence in support of a summary judgment, evidence must be reviewed in light of its admissibility into evidence at trial. Dr. Siebe's statements to Carrow would not be inadmissible as hearsay because they are used to prove that the statement was made and not the truth of the matter asserted therein. *See generally* McCormick on Evidence § 246 (2d ed. 1972).

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits and testimony, if any, show that there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Rules of Procedure, Trial Rule 56(C); *Papp v. City of Hammond,* (1967) 248 Ind. 637, 230 N.E.2d 326; *Boswell v. Lyon,* (1980) Ind.App., 401 N.E.2d 735; *Tabani v. Hester,* (1977) Ind.App., 366 N.E.2d 193. A fact is "material" for the purposes of summary judgment if it facilitates the resolution of any of the issues involved. *Brandon v. State,* (1976) Ind., 340 N.E.2d 756; *Richards v. Goerg Boat & Motor Co.,* (1979) Ind.App., 384 N.E.2d 1084. Summary judgment also is improper if different inferences can be drawn from undisputed facts. *Smith v. P & B Corp.,* (1979) Ind. App., 386 N.E.2d 1232; *Meier v. Combs,* (1970) 147 Ind.App. 617, 263 N.E.2d 194.

 In determining whether a summary judgment motion was properly granted, facts set out in the opponent's affidavits are taken as true. Depositions, admissions, and so forth are liberally construed in favor of the opponent of the motion, and any doubt about the existence of a material issue of fact is resolved against the proponent of the motion. *Podgorny v. Great Central Insurance Co.,* (1974) 160 Ind.App. 428, 277 N.E.2d 29; *Doe v. Barnett,* (1969) 145 Ind.App. 542, 251 N.E.2d 688.[4]

With these thoughts in mind, we pay heed to a special statute of limitations[5] for professional malpractice actions which requires the plaintiff to file the cause of action within two years of the date of injury:

No action of any kind for damages, whether brought in contract or tort, based upon professional services rendered or which should have been rendered, shall be brought, commenced or maintained, in any of the courts of this state against physicians, dentists, surgeons, hospitals, sanitariums, or others, unless said action is filed *within two [2] years from the date of the act, omission or neglect complained of.*

Ind. Code § 34–4–19–1 (1976) (emphasis supplied).

Indiana courts have expressly rejected the so-called "discovery rule," which would engage the limitation period at the date the injured party should have reasonably discovered his injury, as being against legislative intent. *Toth v. Lenk,* (1975) 164 Ind. App. 618, 330 N.E.2d 336.

Our Supreme Court, in *Guy v. Schuldt,* (1959) 236 Ind. 106, 138 N.E.2d 891, established an exception to the strict application of the statute of limitations. *See also van Bronckhorst v. Taube,* (1976) 168 Ind.App. 132, 341 N.E.2d 791. In addressing the question whether the statute must be pleaded affirmatively as a defense or whether it is available as a demurrer, the court recognized that equitable principles bar a defendant from asserting the statute of limitations defense if he has fraudulently concealed the cause of action.[6] The Supreme Court reasoned:

It is established by the overwhelming weight of authority that equity will step in with its doctrine of estoppel to prevent an inequitable resort to the statute of limitations by one who has intentionally and fraudulently concealed a cause of action from a party for such length of time that the statute has run. Before the doctrine of estoppel may be used to bar

---

**4.** *See also Crase v. Highland Village Value Plus Pharmacy,* (1978) Ind.App., 374 N.E.2d 58; *Swanson v. Shroat,* (1976) Ind.App., 345 N.E.2d 872; *Hewitt v. Millis,* (1974) 159 Ind.App. 684, 309 N.E.2d 162.

**5.** The present medical malpractice statute of limitations is *Ind. Code* § 16–9.5–3–1 (1976). The new statute covers only injuries which occurred after July 1, 1975, and does not cover injuries occurring before this date that give rise

to actions filed later. *Id.* § 16–9.5–1–7 (1976); *Adams v. Luros,* Ind.App., 406 N.E.2d 1199 (1980).

**6.** The Supreme Court also recognized another exception to *Ind. Code* § 34–4–19–1 in *Chaffin v. Nicosia,* (1974) 261 Ind. 698, 310 N.E.2d 867, in which the court applied the relief provision of *Ind. Code* § 34–1–2–5 (1971) (disability statute) to medical malpractice claims.

the defendant's use of the statute of limitations, the fraud must be of such character as to prevent inquiry, or to elude investigation, or to mislead the party who claims the cause of action.

. . . . .

Fraud may consist of intentional deception, relied upon by another which induces him to part with property or surrender a legal right such as a cause of action....

A cause of action normally accrues when the injurious action occurs although the plaintiff may not learn of the injurious act until later. However, if there is a concealment which prevents the plaintiff from learning of the cause of action, the statute is tolled during such concealment.

Usually, there must be some active effort on the part of one to be guilty of concealment, but where a fiduciary or confidential relationship exists, such as physician–patient, there exists a duty to disclose material information between the parties and a failure to do so results in concealment.

*Guy, supra,* at 107–09, 138 N.E.2d at 891 (citations omitted).

A. Is there a genuine issue of material fact as to whether the doctrine of fraudulent concealment tolled the statute of limitations?

In *Guy* the Supreme Court specifically recognized that two types of conduct by a physician could invoke this equitable doctrine to toll the statute of limitations. The fraud may be active because there is some affirmative effort to conceal the cause of action, or the fraud may be passive because of the existence of an affirmative duty to disclose material information resulting from the fiduciary or confidential relationship. The Appellate Court in *Toth v. Lenk* further explained the distinction between the two types of conduct that could delay or hinder the cause of action, saying:

[*Guy*] reaffirmed the general principles of an estoppel for fraud, which require both intentional conduct by the defendant, and that the plaintiff, relying upon the defense, not only be unaware of the fraud, but also have been unable to discover it in the exercise of diligence. The duty of the physician to disclose that which he knows, or in the exercise of reasonable care should have known, satisfies the requirement of conduct and constitutes a constructive fraud.

*Supra,* at 622, 330 N.E.2d at 339 (footnote omitted).

Thus, resolving all evidentiary doubts in favor of Carrow, we must determine whether Streeter's conduct could fall into either classification.

From the depositions and affidavits of the parties it is apparent a dispute exists as to whether Streeter told Carrow that the pain was psychological and would take a couple of years to go away. The trier of fact could infer from Carrow's assertion that Streeter's intent was to prevent discovery of the cause of action. The same is true of whether Carrow relied on Streeter's advice because she did not believe after the January 11, 1974 visit that the pain was psychological. However, she appears to have taken his advice and used the medicine until the prescription expired. Finally, the parties also dispute whether Carrow discovered or should have discovered her cause of action at the time she relied on Streeter's representations because she did not seek other medical advice until much later, even though the pain continued. Again, Streeter told her that the pain would take about a couple of years to go away. The prescription was for one year. The trier of fact could infer that she reasonably could not have discovered the cause of action at the time of reliance.

As to whether there was a genuine issue of material fact respecting constructive fraud, there must be a fiduciary or confidential relationship during which the duty to disclose material information has not been met. The existence of a fiduciary or confidential relationship, physician–patient, is not disputed in this case. However, the parties do dispute whether Carrow was advised of the use of the stainless steel sutures prior to surgery or whether she was

aware that these sutures could be a potential cause of pain she experienced after surgery.

Because genuine issues of material facts are disputed which may establish tolling of the statute of limitations through the operation of the doctrine of fraudulent concealment, summary judgment was improper as to whether the statute of limitations was tolled.

B. Is there a genuine issue of material fact as to whether fraudulent concealment tolled the statute of limitations until two years prior to the filing of the cause of action?

Assuming fraudulent concealment is established by either passive or active conduct, summary judgment is only proper if uncontroverted evidence most favorable to the nonmoving party establishes that fraudulent concealment ceased tolling the statute of limitations more than two years prior to the filing of the cause of action. Differently stated we must determine if there are genuine issues of material fact as to whether either Streeter's affirmative representations or his failure to disclose material facts operated to toll the statute of limitations until at least July 25, 1974, ... the complaint having been filed on July 25, 1976. Are there genuine issues of material fact as to when his fraudulent concealment ceased?

■ Active fraudulent concealment of a medical malpractice cause of action terminates and the statute of limitations begins to run at the time the impediment to discovery ceases to exist.

"In order to prevent the running of the statute of limitations in proceedings for relief on account of fraud, it must appear not only that the *complainant was in ignorance of the fraud,* but also that he did not have possession of the means of detecting the fraudulent arrangement. If the fraud, although not discovered, ought to have been discovered, and could have been if reasonable diligence had been exercised by the plaintiff, the statute will run from the time discovery ought to have been made. To prevent the barring of an action, *it must appear that the fraud not only was not discovered, but could not have been discovered with reasonable diligence,* until within the statutory period before the action was begun." 34 Am.Jur., Limitations of Actions, § 167, pp. 134, 135. See also, 70 C.J.S., Physicians and Surgeons, § 60, p. 985; 21 St. John's Law Review (1946), p. 77.

It follows that *where the delay or hindrance to the commencement of the action has ceased to operate and is terminated, estoppel is not available for the period following such termination,* and the statute of limitations begins to run. *Fidelity, etc. Co. v. Jasper Furniture Co.* (1917), 186 Ind. 566, 117 N.E. 258; *Landers v. Evers* (1940), 107 Ind.App. 347, 24 N.E.2d 796; *State ex rel. v. Jackson* (1913), 52 Ind.App. 254, 100 N.E. 479. *Guy v. Schuldt, supra,* at 110, 138 N.E.2d at 895–96 (emphasis supplied). The reason that the statute is no longer tolled after the plaintiff has discovered or should have discovered the existence of the cause of action is lack of continued reliance on the representations of the defendant. *van Bronckhorst v. Taube,* (1976) 168 Ind.App. 132, 341 N.E.2d 791. Therefore, if Carrow did not reasonably rely on Streeter's representations at least until July 25, 1974, her action is barred by the statute of limitations. Streeter interprets her conduct to show a total lack of reliance and cites *Toth v. Lenk* as controlling due to similarities in factual patterns. In *Toth* the court found that the evidence most favorable to Toth established a *complete* lack of reliance. Lenk had not treated Toth for some thirty–eight months before the action was filed, Toth had consulted another physician about his illness three years before suit was commenced, and Toth did not allege actual deliberate fraud.

■ As indicated in *van Bronckhorst v. Taube,* representations which by their nature may mislead a plaintiff and induce reliance "are peculiarly questions of fact incapable of resolution by summary proceedings." *Supra* at 144, 341 N.E.2d at 798 (citation omitted).

Carrow alleges that Streeter continually represented to her that the pain was entirely psychological and that her visits to other physicians were for a suspected condition totally unrelated to the stainless steel sutures. Further, although she no longer believed the pain was mental, she accepted his advice until the prescription expired in 1975, that is, she did rely on his representations.

Streeter points to language in *Toth* as support for his contention that Carrow's disbelief in Streeter's advice caused cessation of the tolling:

> It is knowledge of the condition or "injury" rather than its reason that destroys the estoppel and permits the statute to operate. *Cf. Withers v. Sterling Drug, Inc.,* (S.D.Ind.1970) 319 F.Supp. 878.

330 N.E.2d at 340–41. Carrow on the other hand says she did not believe that the diagnosis was proper but because she did not *know* it was improper she decided to take Streeter's advice and allow his treatment to take effect within the time frame represented. When the treatment did not appear to be successful, she sought advice elsewhere and subsequently initiated this action. Thus, there is a question of fact whether she had knowledge or should have had knowledge of the condition or injury before July 25.

As to a factual issue concerning when constructive fraud ceased to toll the statute of limitations, we review the language of *Guy v. Schuldt*:

> There are some statements to the effect that in cases of fraud the action accrues when the plaintiff first learns of the wrong. This is correct where the fraud is of a continuous character and active concealment continues to exist. But where the duty to inform exists by reason of a confidential relationship, when that relationship is terminated the duty to inform is also terminated; concealment then ceases to exist. After the relationship of physician and patient

is terminated the patient has full opportunity for discovery and no longer is there a reliance by the patient nor a corresponding duty of the physician to advise or inform. The statute of limitations is no longer tolled by any fraudulent concealment and begins to run.

236 Ind. at 109, 138 N.E.2d at 895.

▆ In *van Bronckhorst* there was dictum to the effect that *Guy* should not be construed to imply that the last visit of the patient to the physician automatically ceases to toll the statute of limitations:

> It is true that the issue in *Guy* was not whether there were allegations of fraudulent concealment in the complaint, but rather, whether plaintiff therein was entitled to plead and prove such a defense against the statute of limitations. 236 Ind. at 111, 138 N.E.2d at 896. But reversal presupposed that the plaintiff might have been able to plead a case of fraudulent concealment permitting avoidance of the limitations statute–even when the physician–patient relationship terminated *eleven years* before discovery of the cause of action. To interpret *Guy* otherwise is to accuse our Supreme Court of knowingly sponsoring needless waste of litigation expense and judicial time by remanding for further pleadings a complaint which no further pleadings could save. We refuse to so construe *Guy*.

*Supra* at 141, 341 N.E.2d at 797. Thus, *Guy* cannot be taken to mean that termination of the physician–patient relationship ceases to toll the statute of limitations, if termination is defined as the last visit to a physician.[7]

Continuation of the physician–patient relationship may be determined by several factors which tend to show mutual assent to a course of treatment. *See Toth v. Lenk, supra* (Hoffman, J., concurring). Such factors are, for example,

> the frequency of visits, whether a course of treatment was prescribed by the doctor (to be followed with or without con-

---

**7.** Termination of the relationship has no effect upon tolling by active fraud. *van Bronckhorst, supra.*

sultation), the nature of the illness, the nature of the physician's practice and whether the patient began consulting other physicians for the same malady. *Adams v. Luros,* Ind.App., 406 N.E.2d 1199 (1980).

Apparently Carrow decided on April 1, 1974 not to again seek medical advice from Streeter. However, the depositions do not dispel the inference that Carrow followed the one–year course of medication which was prescribed on that date, that she visited other physicians during this time, and that one of them insisted she have faith in Dr. Streeter and affirmed his representations. Even though she saw other physicians, she may not have consulted them about the specific illness for which Streeter was treating her. If she was still receiving treatment from Streeter for a specific illness, the physician–patient relationship as to that illness may still have been in effect. Carrow did not see another physician specifically for treatment of the pain, other than physicians to which she was referred, until July 1975.

Thus there are conflicting inferences that may be drawn from Carrow's course of conduct as to whether the physician–patient relationship between her and Streeter terminated prior to July 25, 1974.

The judgment is reversed and remanded for further proceedings not inconsistent with this opinion.

SULLIVAN and SHIELDS, JJ., concur.