ITERMAN ET AL. *v.* BAKER.

[No. 27,093. Filed June 9, 1938.]

*Paul Brown, Pence, O'Neill & Diven, Owen Boling,* and *Albert Stump,* for appellants.

*Will W. Reller,* and *Bagot, Free & Morrow,* for appellee.

FANSLER, J.—The appellee brought this action against the appellant corporation and the appellant George E. Iterman, and W. C. Heilman and W. M. Stout, who were practicing physicians and surgeons, to recover damages for injuries alleged to have been suffered because of a negligent failure to properly diagnose and treat a broken and dislocated hip. There was judgment against the appellants for $8,000.

The complaint alleges that the doctors who were defendants were practicing physicians and surgeons, actively engaged in the practice of their profession in the city of New Castle, and that they held themselves out as competent, practicing physicians and surgeons; that the appellant corporation was organized for the purpose of operating, and that it operated, a hospital for the treatment of sick and injured persons, and that the other defendants were the employees and agents of the corporation; that the corporation owned and operated a private hospital for gain, and suitable equipment for the treatment of the sick and injured; and that it "held itself out to the public and represented that it and its employes" (the doctors) "were qualified and competent to properly diagnose and treat sick and injured persons, and it agreed with said plaintiff, for a consideration, to properly diagnose and treat his injuries." It is alleged that the plaintiff suffered a dislocation and fracture of the hip; that he was taken to the hospital where the doctors, "at such time being agents and employes of

said New Castle Clinic, attempted to diagnose and treat the injury and fractures sustained by said plaintiff, and to advise him as to the course of treatment to be followed by him; . . . that said defendants, and each of them, carelessly and negligently failed to properly diagnose the condition of said plaintiff then and there existing, and instead of diagnosing the same correctly and as the same then existed, carelessly and negligently found that said plaintiff was suffering from a dislocation of his left hip, and said defendants wholly failed to ascertain that said plaintiff was likewise suffering from a number of extensive fractures to certain bones of the left side of his pelvis; . . . that a physician or surgeon of ordinary skill and qualifications, by a proper physical examination and by use of an X-ray machine, could have found all of the injuries and fractures from which said plaintiff was then suffering, and that if ordinary care and skill had been used by said defendants they could have correctly diagnosed the condition of said plaintiff"; that, after X-ray and other examination, and an operation to reduce the dislocation, the defendant doctors informed the plaintiff that they had "fixed it all right," and that there were no fractures; that no further operation would be necessary, and that the proper treatment would be for him to go home and rest; "that said defendants wholly failed to use the proper and recognized method for reducing and treating the injuries and fractures from which he was then suffering"; that they dismissed him from their hospital within a few hours and sent him home; that, in fact, there were fractures and a condition which permitted the hip joint to be re-dislocated; and that, because of the advice given to him by the defendant doctors, he did not procure further treatment until it was too late to relieve the condition, and he became permanently crippled.

Dr. Iterman testified that the New Castle Clinic is

"an operating force for a hospital," located in a building owned by the Clinic Realty Company; that it is a corporation, and that the doctors are directors; that it employed the help in the building, and collected all fees and charges for services, but that it was not operated for gain, but simply for the convenience of the physicians who had their offices in the building, and that it had operated at a loss to them; that it was not a charitable organization.

The appellee and his wife testified that they were in an automobile accident at night. They were taken to the New Castle Clinic. Dr. Iterman talked to them. He told them that they could go to the County Hospital, a charitable institution, but they told him they could pay their bill. The appellee was taken into the clinic. He told Dr. Iterman that he thought his leg was broken. He was placed on a table and examined by Dr. Iterman, who felt his hip. He was then put on an X-ray table. Dr. Heilman was present. An X-ray picture was taken. Dr. Iterman said he found a dislocation. Drs. Iterman and Heilman discussed the anaesthetic to be used, and administered one. Afterward Dr. Iterman told him he was lucky that there were no fractures; that there was a dislocation, which had been reduced; that there was no danger of a re-dislocation, as it would take as much of a blow the second time as the first to cause a re-dislocation. Dr. Iterman asked them whether they wanted to stay in the hospital or go home. He said that it was not necessary for them to remain; that the dislocation was all right; that appellee would suffer a lot of pain, but lying quietly in bed was about all of the treatment he needed. He advised going home that night, and arranged for an ambulance to take appellee and his wife home. Dr. Iterman told appellee that his family doctor could take care of relieving his pain, and that if he would have his family physician telephone him in the morning

he would tell him what to do. When the appellee got home he sent for Dr. Smullen, his family physician, and reported to him what had been said by Dr. Iterman. Dr. Smullen gave him a hypodermic to relieve pain. Appellee had a "crunching" feeling just below his abdomen. He was in bed for four weeks, mostly on his back. On the first afternoon he was at home, Dr. Green was called in with Dr. Smullen. Dr. Green measured his legs and examined his feet, and testified that there was no shortening in the legs and that the feet were normal. About the fourth week the appellee noticed a difference in the length of his legs, when he put his feet on the floor, and went back to the clinic five or six weeks after the original treatment. He talked with Dr. Iterman, and told him about the pain he was suffering. Dr. Iterman took an X-ray picture of his foot and measured his legs, and said he thought one leg was a little short, but that it was due to "lying in a twist." The doctor said he had destroyed the X-ray picture which he took on the night of the accident, because he had spoiled it and it was no good. The doctor told him that he might have a nerve injury, and that the best thing to do was to attempt to walk. Later he went to other doctors, and finally to specialists, who discovered by X-ray that the hip was dislocated and that there had been a fracture of the pelvis and hip socket; that the dislocation had continued for such length of time that, although various surgical treatments were tried, the condition could not be corrected, and he was permanently lame and partially disabled. He said that he had had no other accident or sickness.

Dr. Iterman testified that the appellee told him he thought he had a broken leg; that he told the appellee there was a County Hospital, where he would be taken care of if he was unable to pay, but that appellee said he did not want to go to the County Hospital, and that he wanted to be taken care of immediately; that he was

taken into the clinic. Dr. Iterman discovered a few cuts and bruises, and the greater trochanter of the left side out of normal position. Appellee was taken into the X-ray room and placed on a table, where he lay on his right side. He was unable to lie on his back on account of the position of the head of the femur. There was no fracture of the thigh bone, and the X-ray picture showed the head of the femur to be out of the hip socket upward and backward one and one-half to two inches. The picture did not show any fractures of the pelvis. Dr. Stout was called in and gave an anaesthetic, and, by manipulation, the bone was pulled down and rotated out and slipped into the cavity with the "characteristic snap." The leg was then moved about and it had all normal movements, and the patient was able to lie on his back, both feet extended, with toes upward. Both legs were measured and found to be of exactly equal length, and the left leg assumed a normal position. The appellee was then placed under a fluoroscope and observed by Dr. Iterman and Dr. Stout. The left leg was moved, and the fluoroscope picture showed the movements to be unimpaired and the outline of the pelvis to be normal, and no fractures were shown. The appellee was placed on a cot and taken in an ambulance to his home. The appellee's leg was propped with pillows and a blanket, but otherwise no measures were taken for immobilizing the injured member. Dr. Iterman examined the X-ray picture taken six weeks after the accident, and testified that it showed a fracture of the pelvis, and that an X-ray picture taken within an hour after the accident should have shown the same thing if the fracture was there that night; that no history of anything had come to his attention since the accident which could have caused the fracture.

There was evidence of many doctors, and, while there were some differences of opinion as to practice, there is much evidence that the treatment and methods used in

treating the appellee were appropriate and recognized by good practice if there had been no fracture. There is evidence of the training and qualifications of the doctor defendants, and no evidence that they were of bad repute or that they were not reasonably qualified by training, practice, and ability to render the services necessary in such cases. The bill for the services rendered was paid to, and receipted for by, the New Castle Clinic.

The appellant corporation has assigned error upon the overruling of its demurrer to the complaint and the overruling of its motion for a new trial.

The complaint is upon the theory that the corporation was engaged in practicing medicine and surgery, and that it contracted to diagnose and treat the appellee's injury. The right to practice medicine is, in this state, controlled by statute. It is held in some jurisdictions that corporations may legally engage in the practice of medicine and surgery. The question involves the consideration and construction of local statutes. Under the statutes of this state it has never been doubted that it is unlawful for a corporation to practice medicine, and any contract made in the name of a corporation, binding it to diagnose or treat ailments or diseases, is not only *ultra vires,* but unlawful and against public policy. The right to practice medicine and surgery under a license by the state is a personal privilege. It cannot be delegated, and a corporation, or other unlicensed person, may not engage in the practice of medicine by employing one who is licensed to do the things which constitute practicing the profession. *State* v. *Williams* (1937), 211 Ind. 186, 5 N. E. (2d) 961. If a licensed physician employs assistants, who work under his direction as assistants, in the practice of medicine or surgery, the *respondeat superior* rule applies. But a licensed physician may not accept directions and instructions in diagnosing and treating ailments from a corporation or an individual

who is not a licensed practitioner. There are cases holding that a corporation is estopped from denying that a physician is its agent, and that it is liable for the physician's negligence, where the corporation has contracted to diagnose or treat diseases. It is undoubtedly true that corporations are liable under their *ultra vires* executed, or partially executed, contracts, and· for the negligence of their agents and servants thereunder, where the contracts are within the apparent scope of their authority, or where the other party to the contract could not be presumed to be cognizant of the invalidity, or where all of the stockholders of the corporation had knowledge of the contract. But, since the statutory limitation upon the power of corporations is for the protection of the stockholders as well as the public, and, since certain activities are forbidden by law as against public policy, and every one is presumed to know the law, difficulty arises in applying the estoppel doctrine, without doing violence to sound principle, where the contracts involved are not only *ultra vires,* but unlawful as against public policy. It has been suggested that, under such a doctrine, a corporation may enter into a contract to practice medicine or the law, an unlawful and *ultra vires* contract, and as soon as the contract is executed in part it becomes enforceable, and the corporation liable in the same·manner as a licensed practitioner. Thus, persons would feel safe in employing corporations to practice law or medicine, and the statutory public policy, that such things shall not be, would be defeated. An estoppel can only arise where the party claiming it has acted to his injury without full knowledge of the facts and without an equal opportunity to know the facts. It cannot arise out of a lack of knowledge of the law, since all have ·an equal opportunity to know the law, and are presumed to know it. The complaint charges that the·corporation contracted to diagnose and treat plaintiff's ailments; that it was

negligent in performing the contract. The defense is that the corporation made no such contract because it had no power to make it. An estoppel would deny the corporation the right to assert illegality, notwithstanding there were no facts involved concerning which the appellee was deceived or was without knowledge. There can be no estoppel on such a basis. Since the corporation could not legally practice medicine, the appellee was bound to know that whoever treated him was not acting for the corporation. The demurrer to the complaint should have been sustained.

There is no evidence of an express contract, and if there was a contract between the corporation and the appellee, as alleged, it must be implied from the facts and circumstances in evidence. The evidence is that the corporation owned the equipment in the hospital and clinic; that it employed those who were engaged therein; and that it collected the bills for services, including the services of the physicians. The appellee came to the hospital, talked to Dr. Iterman, and was treated by him with the assistance of two other doctors. Nothing was said as to whether the services were to be rendered by the doctor or by the corporation. The doctor was a stockholder and director in the corporation. Are these facts such as to necessarily imply a contract by which the corporation agreed to diagnose and treat the appellee's ailments? The facts justify the conclusion that the corporation charged and collected for the use of its hospital facilities and equipment, and for furnishing the services of licensed and qualified physicians and surgeons. Under such a contract the duty of the corporation, in respect to the physicians or surgeons, would be complied with by using reasonable and ordinary care to employ reasonably qualified, reputable, licensed physicians. In such a case the physicians or surgeons are independent contractors. See *Wabash Railroad Co.* v. *Kelley*

(1899), 153 Ind. 119, 52 N. E. 152, 54 N. E. 752, and *Wabash Railroad Co.* v. *Reynolds* (1908), 41 Ind. App. 678, 84 N. E. 992. Such a contract may be assumed to be within the powers of the corporation and is not illegal. It is generally said that a contract on the part of a corporation cannot be implied where the corporation had no power to make an express contract to the same effect. See 14a C. J. §2517, p. 577, and 7 R. C. L. §581, p. 590. And there can be no doubt that, where an intention to make a legal contract can be implied from the facts, an illegal contract will not be implied. There is therefore a complete failure of proof of the contract declared upon in the complaint, and there is no allegation or proof, or attempt to prove, that the corporation was negligent in the selection of doctors who treated the appellee, and therefore no proof of a breach of duty under the most favorable contract that can be implied from the facts. There is therefore no basis for recovery against the corporation, upon the theory of a breach of duty under the contract, that may be implied from the facts.

Error is assigned upon the giving of certain instructions, but appellants have failed to set out in their brief all of the instructions given, and therefore no question as to the correctness of the instructions is presented. But an examination of all of the instructions set out in the brief indicates that the jury was fully and fairly instructed.

During the cross-examination of the appellant Iterman he was asked if he did not know that a representative of the Medical Protective Association called upon Dr. Taylor, who had testified as a witness. The appellants moved to withdraw the submission of the cause because of the misconduct of counsel in asking this question. The motion was overruled, and the court immediately and fully instructed the jury that they should not consider the implication involved in the

question and should not allow it to influence them in arriving at their verdict. The question was highly improper, but we must assume that the jury heeded the admonition of the court, and that the appellant's substantial rights were not invaded.

The wife of the appellee was permitted to answer a question concerning a statement made to her by a doctor, out of the presence of the appellants, advising her to get her husband to the best surgeon they could get as quickly as possible. There was other undisputed testimony to the same effect from other witnesses, unobjected to, so that, if the defendants were damaged by such evidence, the damage was already done. But we cannot see that the testimony was injurious, even though incompetent.

Appellants complain that a doctor was permitted to describe the condition in which he found the appellee 44 days after he left the care of the appellants. But we see no error in this. Such evidence was admissible at least as bearing upon the amount of damages if there was injury because of negligence.

Appellants complain because a doctor was permitted to give his opinion as to what would have been the proper method of diagnosis of appellee's injury, without showing that he was acquainted with the practice in the city of New Castle at the time of appellee's injury. The doctor had testified to his experience and general knowledge of surgical methods; that he practiced in the city of Richmond, and that he had practiced in many towns in Indiana, and that he had once practiced in the hospital at New Castle; that he knew the doctors there; and that he was familiar with the methods used by physicians and surgeons generally in communities similar to New Castle. This was sufficient to qualify him. The same doctor was permitted to testify that, from an examination of the injuries, he was of the opinion that

fractures existed at the time appellee was treated by the appellant Iterman. No reason is seen why this evidence was not competent.

The appellant Iterman contends that the evidence is insufficient to sustain the verdict and judgment against him. There was evidence from which the jury was justified in believing that, at the time the appellee was treated by the doctor, there was a fracture of the hip-joint socket and fractures of the pelvis, and that these fractures would have been disclosed by a reasonably careful examination of an X-ray picture, taken with ordinary care, or by a reasonably careful examination by fluoroscope. The X-ray picture taken by Dr. Iterman had been destroyed, and was not produced at the trial. Dr. Iterman examined the X-ray picture taken afterward, and said that it showed a fracture of the pelvis, and that an X-ray picture taken an hour after the accident should have shown the same thing if the fracture was there that night. The jury may have concluded that the fracture was there, and that the X-ray picture taken by Dr. Iterman would have disclosed it if taken and developed and examined with that degree of care which might reasonably have been expected from a reasonably careful physician under the standards prevailing at the time in the city of New Castle. The evidence is sufficient as to the appellant Iterman.

The judgment is affirmed as to the appellant George E. Iterman; and as to the appellant New Castle Clinic, a corporation, it is reversed, with instructions to sustain the demurrer to the complaint.