**Adolph WEINSTOCK, M.D.,
Defendant-Appellant,**

v.

**Lee Roy OTT, Administrator of the
Estate of Norma Ott, Deceased.**

No. 3–581A122.

Court of Appeals of Indiana,
Third District.

Feb. 9, 1983.

Rehearing Denied April 14, 1983.

Clarence Borns, Borns, Quinn, Kopko & Lindquist, Merrillville, for appellee.

STATON, Judge.

A jury found for the estate of Norma Ott (Ott) in a medical malpractice action against Dr. Adolph Weinstock, M.D. Ott's suit alleged that Dr. Weinstock breached his duty to refer Norma for a diagnostic consultation when he was unable to discover the cause of her disorder. The issues Dr. Weinstock raises on appeal are restated as follows:

I. Should Ott's expert medical witness have been allowed to answer a hypothetical question which assumed some facts which were never put into evidence?

II. Was Ott's expert medical witness familiar with the standard of care in a locality similar to the one in which Dr. Weinstock practiced?

III. Was the statute of limitations tolled by the doctrine of fraudulent concealment?

IV. Was Norma contributorily negligent?

V. Was Dr. Weinstock denied a fair trial by the trial judge's failure to admonish the jury to disregard a remark made by Ott's attorney during closing argument?

Affirmed.

## I.

### Hypothetical Question [1]

Ott called Dr. Christopher Zarins as an expert medical witness. Ott qualified Dr. Zarins through a *voir dire* examination conducted outside of the jury's presence. During this *voir dire* examination, Ott asked Dr. Zarins the following hypothetical question and received the following answer:

Harold Abrahamson, Michael C. Adley, Abrahamson, Reed & Tanasijevich, Hammond, Arthur L. Roule, Jr., LaPorte, for defendant-appellant.

---

1. Ott contends that this issue is waived, citing *Davis v. Schneider* (1979), Ind.App., 395 N.E.2d 283. In *Davis* an objection at trial that a hypothetical question assumed facts not in evidence was deemed waived on appeal because Davis did not indicate "which facts were wrongly included or omitted in the hypothetical question." *Id.*, at 290. The court in *Davis* stated

that neither the objection at trial nor the motion to correct errors was specific as to the alleged error. However, we find that Dr. Weinstock's objection, motion to correct errors, and brief on appeal were specific enough to adequately present the alleged error to the trial court and to preserve it as a contention on appeal.

"Q. Assume for purposes of this question, Dr. Zarins, that Rolling Prairie, Indiana is a town of a thousand people in the county of LaPorte; that Rolling Prairie (sic) had a population in 1970 of approximately a hundred eight thousand people, and that the general practitioner in question between 1972 and 1976 was affiliated with the LaPorte Hospital, which was a rather modern facility of 191 to 213 beds and that there were a number of services, with the exception of neurology and neurosurgery and vascular surgery, available; that is, they had a nuclear medicine department and they had the standard diagnostic tests and diagnostic equipment available for gastro-intestinal work, they had a cardiopulmonary unit, physical therapy department, they had a pharmacy, had a dietary department, a radiology and nuclear medicine department, pathology department, emergency room, obstetrical department, intensive care unit, surgical department, medical surgical— what's called the medical surgical department, pediatric department since 1973, a psychiatry department; assume that LaPorte County, Indiana is a county in northwest Indiana which is about an hour-and-a-half drive from Chicago, Illinois and from its medical centers and major health facilities; that it is a two and-a-half hour drive from Indianapolis and its medical center there at the Indiana University Medical School; assume that it is approximately from Rolling Prairie, Indiana a 20-minute drive to facilities available in South Bend, Indiana where there are many large hospitals and another wide range of medical specialties, and approximately 40 minutes driving time from Lake County, Indiana to medical specialties including vascular surgeons in that county; assume further that the hospital staff at the LaPorte Hospital was composed of physicians from LaPorte, Porter, Starke and St. Joseph counties on a regular and courtesy staff; and, Doctor, based on your medical education, your practical experience both as a general practitioner and your experience there and as a specialist working with general practitioners in the several states that you have noticed, are you familiar with the standard of care required of a physician engaged in the general practice of medicine in a locality similar to the LaPorte, Indiana area during the years 1972 to 1976? [Parentheses original; objections omitted.]

"A. I feel I am very familiar with the type of medical practice situation which you have described in several areas of the country; in Michigan, California, the San Diego area, Maryland area and Illinois, I have seen many practice situations very similar to the kind you describe."

Weinstock objected to this hypothetical question because it assumed facts which were not in evidence. None of the facts assumed in the hypothetical question were in evidence because no evidence had been introduced. The trial judge permitted Ott to qualify Dr. Zarins before the introduction of any other evidence because Dr. Zarins would not be available to testify later. Nevertheless, Weinstock contends that the trial judge erred in allowing the hypothetical question to be answered.

The trial judge did not err in allowing the hypothetical question to be answered. Weinstock is correct that ordinarily an expert witness should not be allowed to answer a hypothetical question which assumes facts unsupported by the evidence or reasonable inferences therefrom. *Chicago South Shore & South Bend R.R. v. Brown* (1974), 162 Ind.App. 493, 502, 320 N.E.2d 809, 815; *Harrison Steel Castings Co. v. Daniels* (1970), 147 Ind.App. 666, 670, 263 N.E.2d 288, 290. This requirement guards against the trier of fact adopting an ex-

pert's opinion which is based on false or inapplicable facts. *See* J. Wigmore, *Evidence in Trials at Common Law,* § 682, at 947 (J. Chadbourn rev. 1979). However, here this safeguard is not needed.

The hypothetical question was asked during a *voir dire* examination outside of the jury's presence. This examination was conducted so that the trial judge could determine whether Dr. Zarins was competent to testify as an expert medical witness. Because of the trial judge's legal experience and expertise regarding the rules of evidence, we presume that he was able to hear the hypothetical question and its answer, then subsequently determine if enough evidence had been admitted to support the facts which the hypothetical assumed. *Cf. Johnson v. State* (1978), 177 Ind.App. 501, 380 N.E.2d 566, 569; *Johnson v. State* (1973), 157 Ind.App. 372, 378, 300 N.E.2d 369, 373.

Dr. Weinstock next asserts that the trial judge erred in considering the answer to the hypothetical question in determining if Dr. Zarins was qualified, because the evidence subsequently admitted during the trial did not support all of the facts which the hypothetical question assumed. Ott counters that the trial judge could consider the answer because most of the facts assumed in the hypothetical question were subsequently in evidence and the trial judge could take judicial notice of those facts assumed which were never put into evidence.

The trial judge could not consider the answer to the hypothetical question in determining if Dr. Zarins was qualified as an expert medical witness because too many material facts assumed in the hypothetical question were never introduced into evidence. Only the following facts assumed in the hypothetical question were eventually in evidence: From 1972 to 1976 Dr. Weinstock was a general practitioner in Rolling Prairie, Indiana and was affiliated with the LaPorte County Hospital. This hospital then had approximately 200 beds and had physicians from nearby Starke County, Indiana on courtesy staff. From the LaPorte

County Hospital it is about an hour and a half drive to Chicago, Illinois; a two and a half hour drive to Indianapolis, Indiana; and a twenty minute drive to South Bend, Indiana. None of the fourteen medical services which were assumed in the hypothetical question to be available at the LaPorte County Hospital were in evidence.

These specific medical services assumed in the hypothetical question could not reasonably be inferred from the evidence and the trial judge did not indicate that he would take judicial notice of them. The application of judicial notice is usually limited to two categories of facts; "facts generally known with certainty by all the reasonably intelligent people in the community and facts capable of accurate and ready determination by resort to sources of indisputable accuracy." *McCormick's Handbook of the Law of Evidence,* 758 (E. Cleary, 2d ed. 1972). The types of medical services assumed in the hypothetical question are not within either of these categories of fact. Ott cites no authority to the contrary which would support the assertion that these medical services are proper subjects for judicial notice. Without such authority, we will not assume that the trial judge took judicial notice of the medical services available at the LaPorte County Hospital.

Because the medical services assumed in the hypothetical question were not in evidence, and because there is no indication that the trial judge took judicial notice of these services, the trial judge could not consider the answer to the hypothetical question in determining if Dr. Zarins was qualified. Ordinarily, the answer to a hypothetical question which assumes facts which are not in evidence and which cannot be reasonably inferred therefrom has no probative value. *Ecker v. Ecker* (1975), 163 Ind.App. 339, 341, 323 N.E.2d 683, 684. However, Ott posits that the failure to prove some of the facts assumed in the hypothetical question affects only the reliability of the answer and the weight it should be given, citing, among other cases, *Ailes v. Ailes* (1937), 104 Ind.App. 302, 306, 11 N.E.2d 73, 75.

The propositions of law set forth in *Ecker* and *Ailes* do not conflict. A hypothetical question must be based on facts in evidence for its answer to have probative value. But this does not mean that the answer to a hypothetical question must be rejected if some of the facts assumed in it, however unimportant, are not established. "The failure [to establish facts assumed in a hypothetical question] which justifies ·rejection [of the answer] must be a failure in some one or more important data, not merely in a trifling respect." 2 J. Wigmore, *Evidence in Trials at Common Law,* § 680, at 941 (J. Chadbourn rev. 1979); *Accord, Epps v. State* (1885), 102 Ind. 539, 554, 1 N.E. 491, 500. This qualification was recognized in *Ailes,* which noted that the answer to a hypothetical question must not be considered when the assumptions in the question are outside the evidence or reasonable inferences therefrom, and are so exaggerated or misleading as to impair the reliability of the answer. *Ailes, supra,* at Ind. 305, 11 N.E.2d 74.

Simply stated, an answer to a hypothetical question cannot be considered if material facts assumed in it are not in evidence. Dr. Zarins answered that he was familiar with the type of medical setting assumed in the hypothetical question. However, the available medical services assumed in the question constituted a substantial, material part of that medical setting. Because these medical services were not in evidence, the trial judge could not consider the answer to the hypothetical question in determining if Dr. Zarins was qualified.

Yet, Dr. Weinstock has not established reversible error. Although the trial judge determined that Dr. Zarins was qualified to give an opinion as an expert medical witness, Dr. Weinstock has not shown that the trial judge based this determination on the answer to the hypothetical question. The issue, as discussed in section II of this opinion, is whether there is sufficient evidence

besides the answer to the hypothetical question to support the trial judge's determination that Dr. Zarins was qualified. If there is sufficient evidence apart from the answer, then the trial judge has not committed reversible error.

## II.

### Standard of Care

During Norma's second stay at the Billings Hospital in July of 1976, Dr. Christopher Zarins correctly diagnosed her condition as Ischemic Bowel disease, a disorder caused by an inadequate blood supply to the bowel. Dr. Zarins operated on Norma in October of 1976 to remove an occlusion at the juncture of her superior mesentery artery and her aorta. However, because of the advanced state of her bowel's deterioration, the operation did not prevent her death on October 14, 1976.

Ott called Dr. Zarins as an expert medical witness.[2] Dr. Zarins testified that Dr. Weinstock's failure to refer Norma for a diagnostic consultation from May of 1974 through June of 1976 fell below the standard of care which Dr. Weinstock owed to Norma. Since Dr. Weinstock is a general practitioner, this standard is the average · degree of skill exercised by general practitioners in Dr. Weinstock's locality or in a similar locality. *Worster v. Caylor* (1953), 231 Ind. 625, 630, 110 N.E.2d 337, 339; *Iterman v. Baker* (1938), 214 Ind. 308, 320, 15 N.E.2d 365, 371. *Schillinger v. Savage* (1917), 186 Ind. 189, 191, 115 N.E. 321, 322; *Gramm v. Boener* (1877), 56 Ind. 497, 501; *Kranda v. Houser-Norborg Medical Corp.* (1981), Ind.App., 419 N.E.2d 1024, 1040; *Joy v. Chau* (1978), 177 Ind.App. 29, 377 N.E.2d 670, 675; *Bassett v. Glock* (1977), 174 Ind. App. 439, 444, 368 N.E.2d 18, 21–22.

Dr. Weinstock contends that Ott did not sufficiently establish that Dr. Zarins was familiar with the standard of care exercised

**2.** Ott concedes that expert medical testimony was required to establish a prima facie case. Such testimony would not have been needed if the matter had been within the common knowledge of experiences of laymen. *Kranda v.*

*Houser-Norborg Medical Corp.* (1981), Ind. App., 419 N.E.2d 1024, 1037; *Frantz v. Community Hospital, Inc.* (1980), Ind.App., 412 N.E.2d 122, 124–125.

by general practitioners in Dr. Weinstock's locality, or in a similar locality. Therefore, Dr. Weinstock asserts, the trial judge erred when he determined that Dr. Zarins was qualified to testify that Dr. Weinstock breached the applicable standard of care. Ott concedes that Dr. Zarins was not familiar with the standard of care exercised in Dr. Weinstock's locality, but asserts that Dr. Zarins was familiar with the standard of care exercised in similar localities.

■ The trial judge did not err when he determined that Dr. Zarins was qualified to testify that Dr. Weinstock failed to meet the standard of care. A trial judge has broad discretion to determine if an expert medical witness is properly qualified. *E.g., Davis v. Schneider* (1979), Ind.App., 395 N.E.2d 283, 290. The trial judge's determination that Dr. Zarins was properly qualified could be disturbed on appeal only if that determination was an abuse of discretion. Here, the trial judge's determination was not an abuse of discretion.

The factual foundation for Dr. Zarin's competency as an expert on the medical standard of care required of Dr. Weinstock consists of two groups of facts; those facts concerning Dr. Weinstock and his locality and those facts concerning Dr. Zarins and the localities with which he was familiar.

The following facts concern Dr. Weinstock and the locality in which he practiced. Between 1972 and 1976 Dr. Weinstock was a general practitioner in Rolling Prairie, Indiana and was affiliated with the LaPorte County Hospital. This hospital then had approximately two hundred beds and had physicians from nearby Starke County, Indiana on courtesy staff. From LaPorte County it is about an hour and a half drive to Chicago, Illinois, a two and a half hour drive to Indianapolis, Indiana; and a twenty minute drive to South Bend, Indiana.

In addition to the above facts, Ott maintains that the trial judge could take judicial notice of the population of Dr. Weinstock's locality, which is Rolling Prairie, Indiana and LaPorte County, Indiana. Dr. Weinstock asserts that this Court should not consider the population of his locality in our

determination of whether the trial judge abused his discretion by finding that Dr. Zarins was qualified. Dr. Weinstock bases his assertion on the fact that the trial judge failed to disclose that judicial notice of the population of Dr. Weinstock's locality was being taken.

■ The trial judge did not have to disclose that judicial notice of population was being taken for this Court to consider the population of Dr. Weinstock's locality. Dr. Weinstock is correct that usually the trial judge is required to disclose that he shall take judicial notice of some fact. Such disclosure provides a party with an opportunity to object that the fact is not proper for judicial notice. *In re Marriage of Gray* (1981), Ind.App., 422 N.E.2d 696, 703; M. Seidman, *The Law of Evidence in Indiana,* 156 (1977). However, the trial judge need not disclose that judicial notice of a fact is being taken if such disclosure would be superfluous. *Gray, supra,* at 703.

■ It would have been superfluous for the trial judge to disclose that judicial notice was being taken of the population of Dr. Weinstock's locality. Dr. Weinstock does not allege that he was unaware that the trial judge was considering the population of Dr. Weinstock's locality in determining if Dr. Zarins was qualified. Indeed, it was apparent during Ott's qualification of Dr. Zarins that Ott was using population as one element in establishing geographic similarity. In addition, numerous Indiana cases recognize that the population of a locality is a proper subject for judicial notice. *Rosencranz v. City of Evansville* (1924), 194 Ind. 499, 501, 143 N.E. 593, 594; *Stine v. Shuttle* (1962), 134 Ind.App. 67, 74–75, 186 N.E.2d 168, 172. This issue is so well settled that even a reviewing court will take judicial notice of a locality's population. *Estate of Rhoden v. McPeak* (1968), 143 Ind.App. 537, 540, 241 N.E.2d 800, 801; *Stine, supra.*

■ Therefore we include the population of Dr. Weinstock's locality in our review of the trial judge's determination that Dr. Zarins was properly qualified. Between

1970 and 1980, Rolling Prairie, Indiana had an estimated population of 600 and LaPorte County, Indiana had a population of approximately 106,000. *1980 Census of Population: Number of Inhabitants and Characteristics of the Population of Indiana*, vol. 1, ch. A, part 16, table 4 (1982); *1982 Rand McNally & Co. Commercial Atlas & Marketing Guide, United States Index*, p. 300 (113th ed.).

Having set forth the facts regarding Dr. Weinstock and his locality we now set forth the facts concerning Dr. Zarins and the localities with which he was familiar. Dr. Zarins currently practices vascular surgery at the University of Chicago. He also gives instruction at the medical school there on vascular disorders, such as diseases of the arteries and veins, clotting, and other circulatory problems. Based on this foundation alone, Dr. Weinstock would be correct that Dr. Zarins would not be qualified to testify as to the standard of care exercised by general practitioners in Dr. Weinstock's locality. *See Searcy v. Manganhas* (1981), Ind.App., 415 N.E.2d 142, 144 (*trans. denied*). However, Ott introduced further evidence.

Ott established through the following evidence the extent of Dr. Zarins' education and experience. Dr. Zarins received his medical degree in 1968 from Johns Hopkins University. In 1974 he completed his internship and general surgical residency at the University of Michigan at Ann Arbor. While Zarins was there, the university hospital received referrals from general practitioners in small communities throughout Michigan.

For two weeks during his residency, Zarins took over the out-patient practice of a general practitioner in a rural Maryland town, approximately one hundred miles from Baltimore, Maryland, with a population of about thirty-five hundred. His emergency room experience included work at St. John's Hospital in Detroit, Michigan, a large hospital with about five hundred beds, and the Wayne County General Hospital in Livonia, Michigan. He also worked for two weeks in the emergency room at a hospital in Ocean City, Maryland, a small resort town on the Atlantic coast. From 1974 through 1976 Dr. Zarins served in the Navy and was stationed in San Diego. While there he worked at Sharp Hospital and Villa View Hospital, which had about one hundred beds.

Dr. Zarins testified that his familiarity with the standard of care of general practitioners in small towns and small hospitals was based on his direct observations of the manner in which these general practitioners treated their patients, his consultations with the many general practitioners that had referred their patients to him, and his review of the medical charts of those referred patients.

Dr. Weinstock contends that the above foundation is inadequate to qualify Dr. Zarins. No Indiana case has delineated what specific criteria is necessary to sufficiently establish familiarity with a standard of care or to sufficiently establish that localities are similar. For example, criteria which have been suggested to establish similarity of localities include: geographic location, population, the proximity of the localities being compared, the proximity of the localities to various medical facilities, whether the types of medical facilities available are similar, whether the localities are in the same state, and the "character" of the localities in general. *Tallbull v. Whitney* (1977), 172 Mont. 326, 335, 564 P.2d 162, 166–67; *Gambill v. Stroud* (1976), 258 Ark. 766, 770, 531 S.W.2d 945, 948 (on pet. for reh.); *Sinz v. Owens* (1949), 33 Cal.2d 749, 753, 755, 205 P.2d 3, 5–6; RESTATEMENT (SECOND) OF TORTS § 299A, Comment g (1965); *See generally* Annot., 37 A.L.R.3d 420.

The leading Indiana case on this subject is *Iterman v. Baker* (1938), 214 Ind. 308, 15 N.E.2d 365. In *Iterman,* the Indiana Supreme Court reviewed a challenge to a medical expert's competency without reference to any specific criteria:

"Appellants complain because a doctor was permitted to give his opinion as to what would have been the proper method of diagnosis of appellee's injury, without showing that he was acquainted with the

practice in the city of New Castle at the time of appellee's injury. The doctor had testified to his experience and general knowledge of surgical methods; that he practiced in the city of Richmond, and that he had practiced in many towns in Indiana, and that he had once practiced in the hospital at New Castle; that he knew the doctors there; and that he was familiar with the methods used by physicians and surgeons generally in communities similar to New Castle. This was sufficient to qualify him. The same doctor was permitted to testify that, from an examination of the injuries, he was of the opinion that fractures existed at the time appellee was treated by the appellant Iterman. No reason is seen why this evidence was not competent."

*Iterman,* at Ind. 320, N.E.2d 371.

■ The general review standard of *Iterman* is consistent with the rule in Indiana which allows the trial judge broad discretion to determine if an expert medical witness is competent. We decline Dr. Weinstock's suggestion to restrict the general review standard of *Iterman* by requiring a checklist of threshold criteria necessary to establish familiarity with a standard of care or similarity of localities. Instead we employ the general review standard of *Iterman* and will reverse the trial judge's determination that Dr. Zarins was properly qualified only if that determination was an abuse of discretion.

The trial judge's determination that Dr. Zarins was qualified was not an abuse of discretion. Ott established at trial that Dr. Weinstock was a small-town general practitioner, affiliated with a small hospital, rela-

tively near large cities with major medical facilities. Ott further established that Dr. Zarins was familiar with the standard of care of general practitioners in these types of localities through his direct observations of their treatment of patients and through his review of their treatment upon referral. Based upon this foundation, the trial judge did not abuse his discretion by finding that Dr. Zarins was sufficiently familiar with the standard of care exercised by general practitioners in localities similar to Dr. Weinstock's. Therefore, the trial judge did not err by allowing Dr. Zarins to testify that Dr. Weinstock failed to meet the applicable standard of care.

### III.

### Fraudulent Concealment

Dr. Weinstock contends that the trial court erred in denying his motion for judgment on the evidence because Ott's claim was barred by the two year statute of limitations. *See* IC 34–4–19–1 (Burns Code Ed.).[3] Ott's expert medical witness, Dr. Zarins, testified that Dr. Weinstock's failure to refer Norma for a diagnostic consultation from May of 1974 through June of 1976 fell below the standard of care required of Dr. Weinstock. Thus, the two year limitation period would ordinarily begin to run from June of 1976. *See Montgomery v. Crum* (1928), 199 Ind. 660, 679, 161 N.E. 251, 259.[4] Ott's complaint was filed September 11, 1978, more than two years after Dr. Weinstock's alleged malpractice.

3. Both parties incorrectly posit that IC 16–9.5–3–1 (Burns Code Ed., 1982 Supp.) is the applicable statute of limitations. However, Ott's claim is governed by IC 34–4–19–1 (Burns Code Ed.). Dr. Weinstock had failed to qualify himself under Indiana's Medical Malpractice Act, IC 16–9.5–(1–1 to 10–5). Therefore, no provisions of that act applied to him.

"A health care provider who fails to qualify under this article is not covered by the provisions of this article and is subject to liability under the law without regard to the provisions of this article. If a health care provider does not so quality [qualify], the patient's

remedy will not be affected by the terms and provisions of this article." [Brackets original], IC 16–9.5–1–5 (Burns Code Ed., 1982 Supp.).

4. Ott asserts in passing that Dr. Weinstock's malpractice extended until September 29, 1976. However, there was no expert medical evidence that Dr. Weinstock committed malpractice after June of 1976. Such evidence was required in this type of medical malpractice case to find that Dr. Weinstock had committed malpractice. *See* Section II of this opinion.

Even so, Ott contends that the complaint was timely filed because the statute of limitations was tolled by the doctrine of fraudulent concealment. *See Guy v. Schuldt* (1956), 236 Ind. 101, 138 N.E.2d 891. Because of the fiduciary nature of the physician-patient relationship, a physician has a duty to disclose material information to the patient and a failure to do so results in fraudulent concealment. *Adams v. Luros* (1980), Ind.App., 406 N.E.2d 1199, 1202. The duty to disclose ends when the physician-patient relationship is terminated. From this termination, there is no longer a fraudulent concealment and the statute begins to run. *Id.*

The doctrine of fraudulent concealment is not an exception to the limitation statute, but constitutes an equitable estoppel. *Van Bronckhorst v. Taube* (1976), 168 Ind.App. 132, 138, 341 N.E.2d 791, 796.

"Accordingly, where the patient learns of the malpractice or learns information which would lead to discovery of the malpractice if the patient exercised diligence to discover, the statute will commence to run.[4] [Citations omitted].

\* \* \* \* \* \*

---

[4] Until the patient learns something to the contrary he is entitled to rely upon the physician faithfully discharging his duty." [Brackets added; footnote original.]

*Toth v. Lenk* (1975), 164 Ind.App. 618, 623, 330 N.E.2d 336, 340.

Dr. Weinstock asserts that the physician-patient relationship ended more than two years before Ott's complaint was filed. Alternatively, he asserts that Norma failed to exercise due diligence to discover Dr. Weinstock's malpractice.

"In reviewing the trial court's ruling on a motion for judgment on the evidence, this court must consider only the evidence and reasonable inferences most favorable to the non-moving party. *Killebrew v. Johnson* (1980), Ind.App., 404 N.E.2d 1194; *Ortho Pharmaceutical Corp. v. Chapman* (1979), Ind.App., 388 N.E.2d 541. Judgment on the evidence in favor of the defendant is proper when there is an absence of evidence or reasonable inferences in favor of the plaintiff upon an issue in question. The evidence must support without conflict only one inference which is in favor of the defendant. *Palace Bar, Inc. v. Fearnot* (1978) [269] Ind. [405] 381 N.E.2d 858; *Arnold v. Parry* (1977) [173] Ind.App. [300] 363 N.E.2d 1055. If there is any probative evidence or reasonable inference to be drawn from the evidence, or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper. *Keck v. Kerbs* (1979), Ind.App., 395 N.E.2d 845; *Arnold, supra.*"

*Large v. Gregory* (1981), Ind.App., 417 N.E.2d 1160, 1163.

The trial court did not err in denying Dr. Weinstock's motion for judgment on the evidence. The reasonable inferences from the evidence most favorable to Ott could support the jury's factual conclusion that the physician-patient relationship continued to within two years of Ott's commencement of this action, and that Norma did not fail to exercise due diligence.

Dr. Weinstock is engaged in the general practice of medicine in the town of Rolling Prairie, in LaPorte County, Indiana. He had been Norma's family physician since 1956. Norma first consulted him for her abdominal pains in October of 1972. Despite several office examinations and two stays at the LaPorte County Hospital for testing, Dr. Weinstock was unable to find the cause of her problem. As a result, he referred her to a local surgeon, Dr. William Moore. Dr. Moore, assisted by Dr. Weinstock, removed four feet of gangrenous bowel from Norma during exploratory surgery in November of 1972.

After her surgery, Norma continued to consult both Dr. Weinstock and Dr. Moore complaining of abdominal pains. In March of 1973 Dr. Weinstock again had Norma admitted to the LaPorte County Hospital for further testing but was still unable to make a correct diagnosis. Because Norma's abdominal pains persisted after her March hospitalization, she continued appointments with Dr. Weinstock and Dr. Moore.

In May of 1974, at the request of her husband, Norma visited the Caylor-Nickel Hospital in Bluffton, Indiana. The physician who examined Norma there suggested she undergo various tests, asked to examine her medical records, and noted that she was to be referred to a gastroenterologist. Norma did not follow the recommendations of the Caylor-Nickel physician. Instead, she continued with office examinations by Dr. Weinstock.

In December of 1975 and June of 1976 Dr. Weinstock again had Norma admitted to the LaPorte County Hospital for testing. After both hospitalizations Norma continued to see Dr. Weinstock with complaints of abdominal pain.

Because of her consistent abdominal pains, in July of 1976 Dr. Weinstock transferred Norma to Billings Hospital at the University of Chicago where she underwent numerous diagnostic tests for approximately four weeks. At the beginning of the fifth week Norma's condition greatly worsened. Because of this she discharged herself from the Billings Hospital against their medical advice.

A few days later on August 31, 1976 Norma saw Dr. Weinstock in his office and the next day he admitted her to the LaPorte County Hospital. During this hospital stay, Dr. Weinstock saw Norma each day, sometimes twice a day. Dr. Weinstock testified that during this time he considered himself to be her physician and that she was not under the care of any other physician.

Norma's husband was dissatisfied with the care she was receiving at the LaPorte County Hospital and took her back to Billings Hospital on September 29, 1976. In all, Norma saw Dr. Weinstock for more than fifty-five office examinations between the fall of 1972 and September of 1976. During this entire course of treatment Norma never lost confidence in Dr. Weinstock and followed all his medical recommendations, except to give up smoking.

"There are many factors that enter into the analysis of determining when a physician-patient relationship ends. The subjective views of parties are important and a consideration must be given to objective factors, including, but not limited to, the frequency of visits, whether a course of treatment was prescribed by the doctor (to be followed with or without consultation), the nature of the illness, the nature of the physician's practice and whether the patient began consulting other physicians for the same malady." [Parentheses original.]

*Adams, supra,* at 1203.

Dr. Weinstock puts great emphasis on the last factor set forth in *Adams,* "whether the patient began consulting other physicians for the same malady." He stresses that Norma consulted Dr. Moore and other physicians at the Billings Hospital, as well as the physician at the Caylor-Nickel Hospital.

We fail to see how Norma's consultations with Dr. Moore and those physicians at the Billings Hospital could have ended her physician-patient relationship with Dr. Weinstock. Norma was following Dr. Weinstock's course of treatment by going to Dr. Moore and the Billings Hospital. We interpret the last factor in *Adams* as concerning a patient's consultation with another physician on the patient's own initiative, like Norma's visit to the Caylor-Nickel Hospital, and not as a result of a patient's following a physician's referral. Independently seeking other physicians' opinions after a substantial period of treatment would evince a patient's loss of confidence in his physician and a desire to forgo that physician's recommended course of treatment. Such an interpretation of the last factor in *Adams* is consistent with a construction of the subjective views of the parties as inferred from their conduct.

Regardless of the fact that Norma was treated by other physicians for the same problem, and that she went to the Caylor-Nickel Hospital on her own initiative, she did not as a matter of law end her physician-patient relationship with Dr. Weinstock. These actions were merely factors to be weighed by the jury.

As maintained by Ott, the jury could have reasonably inferred from the evidence that the physician-patient relationship continued until September 29, 1976. Norma never lost confidence in Dr. Weinstock and followed his approximately four year course of treatment. Except for the single office examination by the Caylor-Nickel physician in May of 1974, Norma was treated exclusively by Dr. Weinstock, her long-time family physician, and those physicians to whom he had sent her. Finally, Dr. Weinstock considered himself to be Norma's physician until she left his care on September 29, 1976. The reasonable inferences from the evidence support the jury's determination that the physician-patient relationship continued until September 29, 1976.

Dr. Weinstock's alternative assertion must also fail because the jury could have reasonably inferred that Norma did not fail to exercise due diligence to discover Dr. Weinstock's malpractice.

"It is settled that when the patient learns of the malpractice or learns information which would lead to discovery of the malpractice through diligence, the statute commences to run, regardless of the concealment. *Toth v. Link*, (1975) 164 Ind.App. 618, 330 N.E.2d 336."

*Adams, supra,* at 1203.

Dr. Weinstock asserts that Norma failed to exercise due diligence because, aware of her continuing ill health, she failed to follow the Caylor-Nickel physician's recommendations and, later, checked herself out of the Billings Hospital against their medical advice. In support of his assertion, Dr. Weinstock cites *Snyder v. Tell City Clinic* (1979), Ind.App., 391 N.E.2d 623, and *Toth v. Lenk* (1975), 164 Ind.App. 618, 330 N.E.2d 336. In *Toth* this Court held that where a patient was aware of the continuing nature of his problem and was convinced that his physician was not properly identifying and treating his problem, the patient had information which would have provided discovery of the malpractice if it had been pursued with diligence. *Toth,* at Ind. 624, N.E.2d 340. Similarly, in *Snyder* we held that the plaintiff failed to exercise due dili-

gence when he had continuing medical problems and yet, failed to follow the course of treatment recommended by his physician, the defendant. *Snyder,* at 629.

Norma's failure to follow the recommendations of the Caylor-Nickel physician does not establish failure to exercise due diligence to discover Dr. Weinstock's malpractice as a matter of law. Both *Toth* and *Snyder* are distinguishable from the present case. Unlike the patients in *Toth* and *Snyder,* Norma never lost confidence in Dr. Weinstock, she continued under his course of treatment, and she followed all his recommendations, except to give up smoking. The jury could have reasonably inferred that Norma's decision not to pursue treatment by the Caylor-Nickel physician merely supported Ott's position that she continued to have confidence in Dr. Weinstock and chose to follow his course of treatment.

Also, the jury could have reasonably inferred that Norma was diligent even though she checked herself out of the Billings Hospital against their medical advice. Norma had been at the Billings Hospital for four weeks of unsuccessful testing. After these four weeks Norma's condition still had not been correctly diagnosed. There is no indication that if she had stayed at Billings Hospital she would have learned any information beyond what she already knew, which would have alerted her that Dr. Weinstock had committed malpractice. Dr. Weinstock's belief to the contrary is conjecture. Without doubt, Norma was aware of the continuing nature of her medical problem and that she had not been referred to the Billings Hospital until July of 1976. However, that Norma knew that Dr. Weinstock had not referred her for a diagnostic consultation until July of 1976 does not mean, as a matter of law, that she had sufficient knowledge, which would have led to her malpractice discovery if pursued with diligence. Dr. Weinstock's failure to refer her sooner constituted malpractice. Such knowledge of malpractice is beyond the ken of laymen like Norma and is the precise reason for the requirement of expert medi-

cal testimony.[5] As this Court stated in Adams:

"We, again, think there is a factual controversy as to exactly when Adams, as a reasonable person, had sufficient knowledge to know that the malpractice had occurred. The fact that, in January of 1977, Adams knew or should have known that a complete myelogram was not taken does not mean, as a matter of law, that Adams had sufficient knowledge to deduce that malpractice had taken place.

"This determination of whether and when Adams had sufficient knowledge to discern that malpractice occurred involves questions of state of mind and what is reasonable and diligent...."

*Adams, supra,* at 1203. Thus, there was a factual controversy as to when Norma "as a reasonable person, had sufficient knowledge to know that malpractice had occurred." *Id.*

Therefore, the trial court did not err in denying Dr. Weinstock's motion for judgment on the evidence. At the very least, reasonable people could find that the physician-patient relationship continued until September 29, 1976, and that Norma did not fail to exercise due diligence to discover Dr. Weinstock's malpractice. As a result Ott's complaint was timely filed because the statute of limitations was tolled by the doctrine of fraudulent concealment.

## IV.

### Contributory Negligence

 Dr. Weinstock next contends that Norma was contributorily negligent because she did not follow the recommendations of the doctor at the Caylor-Nickel Hospital, and because she discharged herself from Billings Hospital against their medical advice. However, this conduct by Norma does not establish contributory negligence as a matter of law. Therefore, Dr. Weinstock's contention is without merit.

One and one-half years after the operation on her bowel, Norma was examined by a physician at the Caylor-Nickel Hospital. That physician suggested that she undergo various tests, asked to examine her medical records, and noted that she was to be referred to a gastroenterologist. Norma did not follow these recommendations. Approximately two years later, Norma was sent by Dr. Weinstock to Billings Hospital where she underwent four weeks of diagnostic testing for the same abdominal problem. At the beginning of the fifth week Norma's condition greatly worsened. Because of this she discharged herself from Billings Hospital, against their medical advice, and returned to the care of Dr. Weinstock.

Whether Norma was contributorily negligent was a question of fact for the jury. Only where the facts and the reasonable inferences therefrom are undisputed can contributory negligence exist as a matter of law. *State v. Melloy* (1980), Ind.App., 398 N.E.2d 1382, 1385; *Petroski v. Northern Indiana Public Service Co.* (1976), 171 Ind. App. 14, 27, 354 N.E.2d 736, 746. Under the circumstances, the jury could have reasonably inferred that Norma was not contributorily negligent.

"The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. *Bain, Admx. v. Mattmiller* (1938), 213 Ind. 549, 13 N.E.2d 712. Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, *which falls below the standard to which he is required to conform for his own protection.* Restatement 2d of Torts § 463 ... We hold that a departure from the general rule is required where the plaintiff is suffering from physical infirmities which impair his ability to function as an 'ordinary reasonable man.' The proper test to be applied in such cases is the test of a reasonable man *under the same disabilities and infirmi-*

---

**5.** *See* Section II of this opinion.

*ties* in like circumstances. On the issue of contributory negligence, mental condition and/or physical incapacities are factors to be considered. *Avey v. St. Francis Hospital & School of Nursing, Inc.* (1968), 201 Kan. 687, 442 P.2d 1013; *Jones v. Bayley* (1942), 49 Cal.App.2d 647, 122 P.2d 293; *Keith v. Worcester & B.V. St. Ry.* (1907), 196 Mass. 478, 82 N.E. 680." [Italics original, footnote omitted.]

*Memorial Hospital of South Bend, Inc. v. Scott* (1973), 261 Ind. 27, 36, 300 N.E.2d 50, 56.

Norma was not contributorily negligent as a matter of law when she did not follow the recommendations of the Caylor-Nickel physician. Norma had been sick for at least one and one-half years when she went to the Caylor-Nickel Hospital. The physician there told her no more about her condition than had Dr. Weinstock; he merely suggested more tests and that she see yet another physician. Dr. Weinstock was Norma's long-time family physician. He was the physician most familiar with her medical history and her current ailment. It was not unreasonable, as a matter of law, for her to return to his care and course of treatment, especially when the Caylor-Nickel physician was no more successful than Dr. Weinstock in diagnosing her illness.

Similarly, whether Norma acted unreasonably when she discharged herself from the Billings Hospital was a question of fact for the jury. Norma died approximately three months after being transferred to the Billings Hospital. At the time of this transfer Norma had been ill for nearly four years. She had lost a considerable amount of weight and she had been in a great deal of pain for a long time. She had been in and out of the LaPorte County Hospital several times and had underwent a plethora of tests. After four weeks of unsuccessful testing at the Billings Hospital, her health became worse. She left the Billings Hospital to return to her home and the care of her family physician. Considering her probable frustration from years of unsuccessful tests, coupled with her extremely poor health, the jury could have found that Norma did not act unreasonably when she discharged herself from the Billings Hospital.

Therefore, the reasonable inferences from the evidence do not establish contributory negligence as a matter of law. Under the circumstances regarding Norma's health and her long time physician-patient relationship with Dr. Weinstock, the jury could have reasonably inferred that Norma was not contributorily negligent.

V.

Remark During Closing Argument

■ Dr. Weinstock's final contention is that he was denied a fair trial because the trial judge failed to admonish the jury to disregard a remark made by Ott's attorney during closing argument. However, this contention is waived because Dr. Weinstock's objection to the remark was not specific, and because he did not request an admonishment.

During closing argument, Ott's attorney asked the jury to "send a message out to the LaPorte County Medical Community." Dr. Weinstock made only a general objection to this statement.

If Dr. Weinstock wanted to preserve the ruling of the trial court on his objection to the remark made by opposing counsel, he should have made a specific objection, rather than a general objection, and requested that the jury be admonished to disregard the remark. *Richmond Gas Corp. v. Reeves* (1973), 158 Ind.App. 338, 345, 302 N.E.2d 795, 801–802. If Dr. Weinstock's request for an admonishment had not been granted Dr. Weinstock should have then tendered a corresponding instruction. *Herman v. Ferrell* (1972), 150 Ind.App. 384, 391, 276 N.E.2d 858, 863. If Dr. Weinstock deemed an admonishment insufficient, he should have stated why the harm done could not be cured by an admonishment and then asked that Ott's claim not be submitted to the jury. *City of Shelbyville v. Morton* (1965), 138 Ind.App. 460, 474, 208 N.E.2d 705, 712. However, Dr. Weinstock did not make a specific objection to the remark; he did not

request an admonishment; he did not tender an admonishment instruction, nor did he ask that Ott's claim not be submitted to the jury. Therefore, the contention is waived. *Cf. Walczewski v. Wright* (1979), Ind.App., 393 N.E.2d 228, 229.

 Even had Dr. Weinstock properly preserved an objection to the remark, this Court could not reverse the judgment. A trial judge has broad discretion in determining what is improper argument. This Court will reverse a judgment because of improper remarks by counsel during argument only when it appears from the entire record that those remarks were probably the means of securing an incorrect verdict. *Roose v. Roose* (1896), 145 Ind. 162, 165–166, 44 N.E. 1, 2; *Sheridan v. Siuda* (1971), 150 Ind.App. 395, 405, 276 N.E.2d 883, 888. The remark by Ott's attorney, which asked the jury to "send a message out to the LaPorte County Medical community", did not secure an incorrect verdict. There is ample evidence in the record to support the jury's verdict.

Affirmed.

GARRARD, J., concurs in result.

HOFFMAN, P.J., concurs in result with opinion.

HOFFMAN, Presiding Judge, concurring in result.

The statute of limitations begins to run at the earliest of two events: 1) after the relationship of physician and patient is terminated or 2) when the patient learns of the malpractice or learns information which would lead to discovery of the malpractice through diligence.

This is the rule as espoused in *Guy v. Schuldt et al.* (1956), 236 Ind. 101, 138 N.E.2d 891, and *Toth v. Lenk* (1975), 164 Ind.App. 618, 330 N.E.2d 336, and the abortive attempt to modify this rule in *Van Bronckhorst v. Taube et al.* (1976), 168 Ind. App. 132, 341 N.E.2d 791 must be rejected.

The evidence presented could support the fact that the physician-patient relationship did not terminate until September 29, 1976, and the patient did not, using diligence, learn of the malpractice prior to that time.